### UNITED STATES v. 25.4 ACRES OF LAND et al.

### Misc. No. 586.

District Court, E. D. New York.
April 11, 1947.

See also 71 F.Supp. 248.

Harry T. Dolan, of Brooklyn, Sp. Asst. to the Atty. Gen. of the U. S., for petitioner-plaintiff.

Charles E. Murphy, Corp. Counsel, of New York City (Alfred D. Jahr, of New York City, of counsel), for defendant City of New York.

BYERS, District Judge.

As recited under this title, in D.C., 61 F.Supp. 251, the report of the Commissioners in Condemnation was remitted to them pending the taking of further testimony as stated. Pending the coming in of a supplemental report, decision of the motions to confirm was reserved, except as to damage parcel 1, as to which both sides urged confirmation, and which was accordingly granted.

The supplemental report and all testimony taken subsequently to the earlier report, as well as the earlier proceedings, are now before the Court for final determination.

The Government moves to confirm except in two respects, and as to them the City moves to confirm, but otherwise to reject. The matters thus in dispute will be treated separately:

*Damage Parcels 5A, 9, and 22A.* The first is a strip on the easterly side of Washington Avenue; the second is the bed of Taylor Street; and the third is land under water, being the 40 feet of the southerly part of the bed of Wallabout Basin running easterly from Washington Avenue to Hewes Street. The highways were legally opened and in use, and were subject to public easements in all respects, and were therefore of but nominal value to the City; the third was subject to easements of navigation, the body of water being a navigable tide-water inlet, and the deed of cession from the United States granted in 1870 having reserved free use of the Basin. This is recited in the first report of the Commissioners.

No substitute facilities having been rendered necessary because of the taking, there is no proof to sustain the fixing of more than nominal damages, and as to these damage parcels the Government's motion to confirm is granted.

*Damage Parcels 5, 10, and 25.* These are all embraced in Washington Avenue. The first and third designate the bed of the street itself. Parcel 10 is land under water in the Wallabout Basin, namely, the northerly part, and is bounded on the west by the mouth of the Canal and on the east by the easterly side of Washington Avenue. The City seeks an award of damages because of improvements on, in and under the streets, and substitute facilities required to be provided as a result of the taking.

The matter of the Washington Avenue Bridge is the first item embraced in this section of the two reports, and no change is made in the later one. The bridge was built with Federal funds (whether in whole or part does not appear) in 1937, and carried Washington Avenue over the Wallabout Channel or Canal, including the car tracks of the trolley line running through Washington Avenue.

It is not contended that any substitute facility, i. e., a new bridge, had to be built by reason of the taking, and the argument of the City is that this costly structure, of which the reproduction cost less depreciation was shown to be $557,984.86, should be compensated to it at more than the salvage value of $5,303 which was awarded by the Commissioners.

In essence, the bridge was a part of Washington Avenue, which itself of course represented a large outlay in surface construction, curbing and the like. If one is to be reckoned as supporting a claim for reimbursement, so should the other.

The cases are clear, however, that in the absence of proof of the necessity for providing highways to take the place of those subjected to the right of eminent domain, the municipality or the state making claim must be deemed to have failed in its proof.

United States v. Des Moines County, Iowa, et al., 8 Cir., 1945, 148 F.2d 448, 449, certiorari denied 326 U.S. 743, 66 S.Ct. 56, decides this issue in reversing a decision in which an award had been made in the District Court "for the taking of said roads and highways, with the bridges, culverts and improvements thereon".

It is said: "If it is unnecessary to replace the roads or to provide substitutes for them, the appellees have suffered no money loss and have been relieved of the burden of maintaining the roads taken." That the cost of constructing substitute roads will afford to the appellees the actual money loss and is the proper measure of damages for the taking, citing cases.

The City relies upon United States et al. v. Benedict, 2 Cir., 280 F. 76, to sustain its claim to an award for the bed of the streets which have been taken. There the City was granted participation in an award for a tract of undeveloped property in this District, fronting upon the upper Bay, as to which there had been a cession of title to the bed of streets which had not been physically opened. The Court seems not to have discussed the nature of the City's title when burdened by public easements, nor to have reviewed the holding below that the deed of cession had not been effective to transfer title to the streets as projected. The Commissioners have given consideration to the case, and have held as a matter of law that it is not presently controlling. In that view this Court is of the same opinion.

It results therefore that no compensation can be awarded to the City for the mere taking of the beds of these streets, nor for so much of the bed of the canal or inlet which is burdened with public easements.

The City undertook to meet the burden of establishing as to the streets taken that it is entitled to reimbursement for having been called upon to provide substitute highway facilities, namely, the widening of Park Avenue, a thoroughfare running east and west, or at right angles to Washington Avenue; Park Avenue (not shown on the Damage Map) intersects Classon Avenue, above the Navy Yard to the east, whence traffic can move into Kent Avenue and thence to the north as desired. The Commission received all testimony offered on this subject, and the second report recites in summary form that upon which the City relies; the conclusion is that the widening and improvement of Park Avenue was initiated prior to and without reference to the taking of the bed of Washington Avenue, and was carried through as part of a larger plan involving a highway development to connect the Boroughs of Brooklyn and Queens; that while the traffic which would have moved through Washington Avenue, in the Wallabout area, did in fact take advantage of the new route above indicated, yet the widening and improvement of Park Avenue was not designed or intended to provide a substitute highway facility for the taking of the damage parcels in question. That this understanding of the situation is not impaired by the knowledge that in part the closing of Washington Avenue was contemporaneous with the highway developments referred to; and that certain temporary improvements in Park Avenue are not to be segregated from the over-all accomplishment in order to support the City's claim.

The evidence will be found to sustain this conclusion on the part of the Commissioners. So far as this Court is concerned, the claim of the City is scarcely plausible, when certain of the announcements appearing in press releases are recalled, touching the purposes of the City to provide improved access by motorists to the site of the recent World's Fair held in 1939 near Flushing.

The widening of Kent Avenue from Washington Avenue to Classon, by 27 feet, was accomplished by the Government, and at its own cost. Thus a substitute street facility has been provided by the taking authority, and the Commission is right in announcing that title to the 27-foot strip is now in process of being vested in the City.

So much of the report as deals with this aspect of the City's claim, which in effect disposes of the subject as an issue of fact, is here found to be in accordance with the greater weight of the evidence.

Substitute facility:

█ (A) *Power line*: The Commission has awarded $169,443.17 for the cost of a new power line construction to transmit high tension current, less the salvage value of the materials reclaimed from the one which was taken, amounting to $18,272.19, leaving $151,170.98 as the amount of the award.

This has to do with the value of an installation of a subsurface duct line to carry five high tension power lines for operation of the B. M. T. subway and trolley feeder lines, the power being generated at the 500 Kent Avenue Williamsburg Power Plant, the main generator station for Brooklyn. By reason of the taking of Washington Avenue, new ducts and pipe conduits had to be constructed, and the existing ones enlarged and rebuilt under Kent Avenue and Classon Avenue, to replace similar subsurface construction under Washington Avenue, between Kent and Flushing Avenues. The cables themselves were reclaimed, except the submarine cables beneath the waterway where Washington Avenue was carried by the bridge, and seemingly the new construction was nearly twice as long as that which was included in the property taken.

That the City was required to provide this substitute facility is too clear to admit of discussion.

One argument of the Government is that since the City owned and rented much if not all of the damage parcels which abutted Washington Avenue, the awards made for taking those properties necessarily included an element of value of property so situated; i. e., the existence of the street as a highway enhanced the values of the abutting parcels. This may be conceded without touching the question of the burden of cost involved in providing substitute ducts and related construction for carrying underground these high tension power lines.

The cases cited to sustain the Government's objection to this element of the report are: United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390; United States v. Petty Motor Co., 327 U.S. 372, 66 S.Ct. 596, and Potomac Electric Power Co. v. United States, 66 App.D.C. 77, 85 F.2d 243. The last alone involves electric power installations. The others deal with the taking of leases, and problems peculiar thereto.

The taking in the Potomac case was of lot 805, square 144 in the City of Washington, on which was located substation 19 of the Electric Power Company. The damage award made by the jury was appealed by the company, and in writing for affirmance the Court discussed certain equipment, namely: The generator set was held to be removable without substantial damage to the real property of the company, while other elements not so to be described (reinforced concrete boxes forming bases for the machinery, conduits within the building, etc.) seem to have been treated as part of the realty, and as to them the jury was said to have been properly instructed.

Finally, as to conduits, cables, manholes, etc., lying in the public streets, beyond the bounds of lot 805, they were held not to have been taken, as "not physically encroached upon by this condemnation".

The discussion by the Court need not be quoted because it will be seen that the case differs essentially from this, in that here the street was taken, and consequently the underlying subsurface constructions. That which was movable (cables mostly) has been credited to the reproduction cost less depreciation of the carrying facilities, and since no one argues that substitutes therefor were not rendered necessary as the result of taking, it is difficult to conceive of a convincing reason to deny just compensation to the City.

While no substitute for the street as a whole has been brought to light, a substitute for one function which it necessarily performed has been shown to have been required; and since the greater includes the less, it is concluded that within the teaching of the Des Moines County case (supra) the award was proper in theory; and since no evidence was offered in contradiction of the figures included in the City's case, so much of the report is approved, and the Government's motion to the contrary is denied.

(B) *The Crosstown Trolley Line*: Another function of Washington Avenue was to carry the tracks of the crosstown line which was necessarily rerouted in order to

maintain necessary service between parts of the city depending thereon. The new route, because Washington Avenue between Flushing and Kent Avenues was excluded, involved the use by trolley cars of Franklin Avenue, Wythe Avenue, and South Eighth Street, upon existing double tracks, plus the installation of a new turnout on Kent Avenue (cost $1,644.67) and a new crossing (i. e. track crossing) on Flushing Avenue ($2,340). Those were the only items of new construction, but the substitute route was .61 of a mile longer, or about 3,220 feet, than the one which had to be discontinued.

The Commission has found that the annual increased operating cost was $30,926.-79, which it capitalizes at the rate of 6%, and awards $515,446.51 to the City as the cost of the substitute facility, in addition to the items of new construction above stated.

The Government presents two contentions in opposition to this part of the report:

(1) That as a matter of law, no such award can be sustained; that is, for an increased cost of operation of a substitute facility.

(2) That the theory of damage, if tenable as a matter of law, has not been demonstrated by the evidence.

Needless to say, this is the critical aspect of the present controversy, and requires discussion.

▆ In considering the first or purely legal theory, it should be said that no case, which decides that compensation should be made for the creation of a substitute facility, includes as an element thereof an estimated increased cost of operating the substitute facility. When it is remembered that the purpose is to compensate for the value of that which is taken, as at the date of vesting title, it will be seen that to expand such a figure by an additional sum deemed to reflect the present value of an added item of expense which may or may not· be incurred (depending upon the desire and ability to operate economically) is to import at best a theoretical and problematical element the very existence of which will be determined by the course of events

as they develop during an indefinite period of time subsequent to the taking.

It is not a question of present value embraced in earning capacity, but a possible future and contingent burden not necessarily to be .thought of as having contemporary existence.

Moreover, it would open the door to the suggestion that if perchance the operating cost of the substitute facility could be argued to be lower, as a matter of probability, than the one existing at the time of taking, the then present value of the latter should be correspondingly diminished, for, if the theory is sound, it ought to work both ways.

Probably the argumentative nature of this concept is one reason for its non-appearance in any of the cases in which the cost of substitute facilities has been computed as an element of damage in condemnation cases.

Reliance seemingly is had by the Commission upon just one sentence taken from the opinion in Town of Bedford v. United States, 1 Cir., 23 F.2d 453, at page 456, 56 A.L.R. 360, where the Court said: "* * * the right to exoneration from the burden of constructing and maintaining a substitute way is a valuable property right belonging to the group of taxpayers called a town."

The presence of the word "maintaining" is not thought to justify the award here made, if that is indeed the reason for inserting the quotation in the report.

The opinion quoted from indicates that the United States had condemned 400 acres of land in Bedford, Massachusetts, for a hospital, including "all rights * * * in and to that portion of Springs road so called, as shown". That the latter was an old road, "used from time immemorial, and maintained at the expense of the town. The taking cuts out about a half mile of the road, but the severance will render other portions unavailable and require new roads to connect the termini. The facts concerning the extent of the damage need not now be stated; for it is stipulated that, if the town is entitled to recover, the amount shall be $10,000."

A judgment adverse to the town was set aside, and the $10,000 award was made. It

is a fair inference therefore that this compensation was made to cover the cost of building the new roads. Nothing was said in the opinion for reversal to the effect that any part of that sum was deemed to be on account of an increased cost of maintaining the new roads.

[6] Nor does it seem that the analogy between the duty of a town to maintain a way, and the City's operation of a trolley line, can be pushed so far as to apply to the present facts. I should suppose that if the City chooses to engage in the business of providing transportation for all and sundry, taxpayers and non-taxpayers, it should be prepared to assume the hazards of all business risks in connection therewith; the loss of profits connected with a business conducted on land which is taken by eminent domain has been held not to constitute a proper element of compensation in the absence of legislative enactment to the contrary. Such damage is resultant or consequential and does not constitute an element of value of the property taken. Mitchell et al. v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644; Omnia Commercial Co., Inc., v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773; Bothwell et al. v. United States, 254 U.S. 231, 41 S.Ct. 74, 65 L.Ed. 238.

It is one thing for a town or city to be required to maintain ways or streets upon which the public may proceed, on foot or under power, and another thing to engage in the business of owning and operating passenger transportation systems. In other words, the Bedford case (supra), interesting and instructive as it is, cannot be deemed to constitute an authority for this award. No case has been cited or found to sustain the conclusion of the Commission as a matter of law; and upon this record I shall decline to assume the responsibility of engrafting, upon the law of condemnation awards, so drastic and speculative an element of asserted damage.

■ Turning to the evidence, the following factual aspects are important:

It is not questioned that, the substitute route being longer by .61 of a mile, two additional cars were put in service to accomplish the same number of trips per day as were maintained prior to the change; this involved increased expense for labor, and car maintenance and operation. The average operating cost per car mile was stated to be $.313 which is said to yield $30,578.98 as the increased annual cost of operating the substitute route (i.e., 97,261.04 additional car miles per year @ $.313).

The unit of cost applied is that of the entire trolley system, not the actual cost of operation of the crosstown line, which for accounting purposes should be identifiable according to its own financial showing.

It is difficult to evade the criticism made by the Government in that respect.

The substitute facility itself is put forward as justifying an award, and the information deemed to be important to sustain the figures ought to have been susceptible of demonstration, as to its actual net revenue contribution to the system as a whole, if a precise result is to be established; it appears that receipts are so segregated in the accounting department of the Board of Transportation of the City, but costs are not.

It is next pointed out that the substitute route was not constructed as a new thing, since existing tracks were employed, with but the two new connections made, and that to attribute to this rearrangement of available construction the status of a substitute facility as a whole, is to conjure up a misleading pattern of decision.

It is permissible to observe in parenthesis, that the diversion of traffic was not even an innovation, because it appears that for about two years when the Washington Avenue Bridge was under construction (1936-7) a similar expedient was rendered necessary, although the precise route then employed was not stated by the City's witness Mombelly.

The rehearing was granted in order to enable the Government to offer testimony designed to offset that of the witness originally called by the City in connection with this claim, and such testimony was received, but nothing new was presented in support of the City's claim.

The Commission has adhered to its former conclusion, and attention is thus drawn to the additional testimony and what it tends to demonstrate.

It may be objected that there is something incongruous in considering what is shown by the figures covering about four years after the taking for the purpose of ascertaining values at the time of taking; the answer is thought to be that since the City relied upon something in the nature of prophecy as of September 19, 1941, to justify its claim of value on that date, it was open to the Government to demonstrate, if it could, that the forecast failed of realization, in the light of what actually took place.

Once an unsound theory of compensation was entertained, all that followed its consideration became relevant, if it were to be tested in any complete sense.

The following tabulations have been made from the testimony of the Government's witness who examined the records maintained by the Board of Transportation and reported the results. The figures were not discredited by the City, nor explained away by the Commission.

Gross Receipts Per Revenue Mile

| Fiscal Year Ended June 30th | Crosstown Line | Average for System |
|---|---|---|
| | Cents | Cents |
| 1941 | 42.51 | 36.26 |
| 1942 | 42.49 | 37.26 |
| 1943 | 51.38 | 42.96 |
| 1944 | 56.49 | 46.21 |
| 1945 | 56.27 | 51.86 |

Net Revenue, Crosstown Line, Using Average System Cost

| Fiscal Year Ended June 30th | Gross Revenue | Cost | Net |
|---|---|---|---|
| | Cents | Cents | Cents |
| 1941 | 42.51 | 27.19 | 15.32 |
| 1942 | 42.49 | 31.31 | 11.18 |
| 1943 | 51.38 | 33.99 | 17.39 |
| 1944 | 56.49 | 39.97 | 16.52 |
| 1945 | 56.27 | 46.46 | 9.81 |

Net Revenue Per Mile of System, Being Receipts less average cost

| Fiscal Year Ended June 30th | Revenue | Cost | Net |
|---|---|---|---|
| | Cents | Cents | Cents |
| 1941 | 36.22 | 27.19 | 9.03 |
| 1942 | 37.65 | 31.31 | 6.34 |
| 1943 | 43.36 | 33.99 | 9.37 |
| 1944 | 46.63 | 39.97 | 6.66 |
| 1945 | 52.33 | 46.46 | 5.87 |

The foregoing demonstrate the soundness of the Government's contention that an award based upon increased operating cost alone, resulting from the addition of two cars to the crosstown line in order to render adequate transportation facilities, does not reflect a true result if an informative comparison is to be made between the facility abandoned as the result of the taking, and the substitute thereafter inaugurated. It must be evident that the results shown provide a complete answer to the question of whether a loss did indeed result from the taking.

So far from the City's having suffered a loss and damage from being compelled to operate the crosstown line over the substitute route, as the Commission concluded, the foregoing figures demonstrate that in each of the four years following the effective date (September 19, 1941) the gross receipts per revenue mile were in excess of the comparable figures for the entire system; and that the similar net receipts were also greater, even though these computations were based upon the unit cost of operation as shown by the entire system; such a formula is favorable to the City, in that some lines include idle miles (i. e., non-revenue producing where the cars travel a distance between car-barns and starting points) while there are none such in the crosstown line.

The subject is further complicated by the abandonment of the Greenpoint line in 1942, and the handling of much of its traffic over the changed route of the crosstown line. An understanding of that development is scarcely to be derived from the testimony, nor could it well be expected to control decision upon this subject, but it was alluded to in some of the testimony.

The Commissioners state that in their view the capitalization of an annually recurring loss is the most acceptable method for ascertaining the just compensation to be paid to the City. With all deference to their opinion, it seems clear that the figures above tabulated dispel any illusion of recurring loss arising from the operation of this substitute facility. The annual receipts per revenue mile have increased since 1942, and have at all times exceeded the average for the system; the net revenues per car

mile in each of the five years since June 30, 1941, have exceeded those for the system as a whole, and in but two of those years has this line itself failed to show a better net revenue per mile than for the year ended June 30, 1941.

In other words, there has been no "annually recurring loss". There has been a greater outlay in the cost of operation, but that has been compensated by a higher percentage of net revenue per car mile, than that of the entire system. Doubtless there was heavier traffic to the Navy Yard during the War years, but that was an incident of the transportation business in which the City was engaged, and may indeed have rendered the two extra cars necessary, rather than the addition of .61 of a mile to the route.

Factually then, the award must be held not to have been justified by the evidence.

The sums mentioned as representing outlay for new construction ($1,655.67 and $2,340) are not contested, and are approved.

The Government's motion to disapprove the award to the City of New York in the sum of $509,649.69, the amount representing "annual operating costs capitalized at 6%", is granted; otherwise the report is confirmed.

The Court is sensible of an obligation to the Commissioners for the care, diligence, patience and fidelity which have characterized their performance of duty.

Settle order in accordance with the foregoing.