**UNITED STATES of America,**
**Plaintiff,**

v.

**CERTAIN LANDS Located IN the TOWNSHIPS OF RARITAN AND WOODBRIDGE, MIDDLESEX COUNTY, NEW JERSEY, et al., Defendants.**

**Civ. A. No. 8788.**

United States District Court
D. New Jersey.

Aug. 30, 1956.

Raymond Del Tufo, Jr., U. S. Atty., by Eugene Friedman, Asst. U. S. Atty., Newark, N. J., for the Government.

Samuel Convery, Perth Amboy, and John T. Keefe, New Brunswick, for defendant Middlesex County.

WORTENDYKE, District Judge.

This condemnation proceeding was instituted in 1946 by the Federal Government. The subject of the condemnation was a portion of a County gravel-surfaced road in Middlesex County, New Jersey.

A jury trial was had and the jury returned a verdict for Middlesex County in the amount of $172,000. The Government now moves, pursuant to Fed.Rules Civ.Proc. rule 50, 28 U.S.C., to set aside the judgment entered upon the jury's verdict and to have judgment entered in accordance with a motion for a directed verdict made by the Government at the close of all of the evidence. In the alternative, the Government seeks a new trial pursuant to Rules 50 and 59. At the same time, the County moves for

208 

amendment of the present judgment so as to include interest upon the amount of the jury's award.

■ The general rule of damages in condemnation proceedings is that the owner is entitled to the full equivalent in money for the property taken. The usual measure employed is the fair market value of the property. Such measure is not appropriate, however, when a piece of road is the property taken for it cannot be said to have any market value, and yet the local government does sustain an actual monetary loss if, as a result of the exercise of the power of eminent domain, a substitute public way must be constructed. Consequently, the rule has developed that upon the condemnation of a public road, which the local government is required to replace, the loss is measured in terms of the cost of furnishing or constructing an appropriate substitute public facility. State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33, certiorari denied 1954, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679; United States v. State of Arkansas, 8 Cir., 1947, 164 F.2d 943; United States v. Des Moines County, Iowa, 8 Cir., 1945, 148 F.2d 448, certiorari denied 1945, 326 U.S. 743, 66 S.Ct. 56, 90 L.Ed. 444. It may be that a new road or highway is required, or it may be that a widening of certain existing facilities is sufficient.

■ If, however, no substitute facility is necessary, the law is well established that no compensation, except nominal damages, may be recovered. As stated succinctly in State of California v. United States, 9 Cir., 1948, 169 F.2d 914, 924:

"The overwhelming weight of modern authority is to the effect that a municipality, a county, a State, or other public entity is entitled to compensation for the taking of a street, road or other public highway *only to the extent that, as a result of such taking, it is compelled to construct a substitute highway.*" (Emphasis in original.)

To the same effect are State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33, certiorari denied 1954, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679; City of Fort Worth, Texas v. United States, 5 Cir., 1951, 188 F.2d 217; and United States v. City of New York, 2 Cir., 1948, 168 F.2d 387.

■ These rules of law seem sound and relatively simple when stated in the abstract. Their application to diverse factual situations does, however, engender complexities. With the network of highways and roads that exist today in many areas, it is seldom that the elimination of a single road makes the construction of another road absolutely essential. More often than not, alternate existing roads will enable vehicular traffic to reach desired destinations, though perhaps not as directly or conveniently as it would absent the condemnation. The resulting diversion may adversely affect the utility of the alternate roads by increasing the burden of traffic which they must bear. Consequently, any test based upon the necessity of substitute facilities must be tempered with considerations reaching beyond absolute necessity. Recognizing this to be so, the test has come to be treated as one of reasonable necessity under all the surrounding circumstances. State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33, 40, certiorari denied 1954, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679, quoting with approval the following language in United States v. Alderson, D.C.S.D.W.Va. 1944, 53 F.Supp. 528, 530:

" 'The test is not what the State wants to build; not what the property owners want for their properties; and not what is the desirable thing to do. Both parties to this litigation would be very anxious to give these people the best roads possible. That would be the most desirable thing to do, but such is not the test. The question is, what is the reasonable thing under all the circumstances?' "

■ Determination as to whether there is a reasonable necessity for a local government to construct substitute public facilities as a result of a condem-

nation may turn upon a complex of fac-tors. Some elaboration of the funda-mental rules was made in City of Fort Worth, Texas v. United States, 5 Cir., 1951, 188 F.2d 217. A later summary of this elaboration is found in City of Fort Worth, Texas v. United States, 5 Cir., 1954, 212 F.2d 474, 475–476:

" \* \* \* the city was entitled to an award sufficient to provide such traffic facilities as were necessary to restore its entire adjacent system of such facilities to the same status of utility as was enjoyed prior to the taking; that nearby facilities were entitled to no weight other than such as might be proper to determine the extent to which their presence would withdraw traffic from the con-demned highway even if it were still in use, or to the extent that, by im-provement or betterment, they might properly be made to provide ade-quate substitute facilities; *that the true test is not whether the substi-tute facilities already in existence will carry the traffic, diverted and non-diverted, but rather what com-pensation is necessary to enable the city to provide a facility that will carry the entire load in an equally adequate manner as would have been true had there been no condemna-tion;* that it will not at all do to say that, in determining the cost of pro-viding any necessary substitutes, an award in condemnation may be de-nied because there are already in existence other available routes which will in some fashion handle the traffic diverted by the condemna-tion; and that the cost of adequate substitute facilities to be so comput-ed is proper whether such sum be more or less than the value of the street and the facilities taken. The opinion recognizes the duty of the municipality to provide for a neces-sary readjustment of its traffic fa-cilities, and that the amount of com-pensation due it is the cost of the necessary substitute facilities." (Emphasis supplied.)

One other matter will bear ex-ploration before turning to the facts of the instant case. As a general rule, the date of taking is controlling.

"A condemnation case involves a taking, as of a certain date, and the case is tried with the eyes of the court and jury fastened to the date of taking, and some short but rea-sonable period before or after the taking. The question in our case is —was there a reasonable necessity as of July 1943, to replace the high-way taken? If so, what was a rea-sonable substitute route as of that date?" State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33, 47, certiorari denied 1954, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679.

With this brief reference to the law, we may turn to the facts in the instant case, bearing in mind that the issue is whether, as a result of the taking by the Federal Government, there was a rea-sonable necessity for Middlesex County to construct a substitute public road. The ordinary difficulty of resolving such a factual issue is somewhat complicated by the fact that the taking occurred in the Spring of 1942 and the testimony of witnesses on matters crucial to the liti-gation was based upon recollection of oc-currences which took place fourteen years ago. A few fundamental facts do, however, appear uncontroverted.

Prior to World War II, the Federal Government owned a tract of land in Raritan Township, Middlesex County, New Jersey, known as the Raritan Ar-senal Reservation. The tract was bound-ed on the south by the Raritan River, on the north by Woodbridge Avenue and on the east and west by large areas of meadow lands. About nine months be-fore Pearl Harbor, the Board of Chosen Freeholders of Middlesex County, after negotiations with the Works Progress Administration, adopted a resolution pro-viding for the construction of a forty-foot black-top road, upon a right-of-way one hundred feet in width, running south-easterly across the meadow lands lying east and entirely outside of the Raritan

Arsenal. The proposed road connected Woodbridge Avenue in the Bonhamton Section of Edison Township (formerly Raritan Township) with State Street in the Keasbey Section of Woodbridge Township. The proposed road was approximately two and one-half miles in length and was to be without intersections except that of Meadow Road which extended in a southerly direction from King George's Road to and across the proposed road. At the time the resolution was passed, vehicular traffic traveling between the points to be served by the proposed road was required to go by way of the Fords Section of Woodbridge Township and pass through the intersection of New Brunswick Avenue and King George's Road. The distance between the two points when following this latter route is about three and one-half miles. For through traffic, the proposed road would afford a much shorter, quicker and easier trip between Woodbridge Avenue and State Street. Any use of the proposed road by through traffic would be bound to reduce traffic in the Fords Section.

The resolution of the Board of Chosen Freeholders set forth the purpose of the proposed highway. The resolution made no mention about through traffic or any improvement in the overall traffic facilities of the County. Rather it stated that the new road was to be constructed "for the purpose of making possible the development of * * * (the meadow) lands for industrial purposes," and that the road was to be known as the Industrial Highway. Towards the cost of the project, the County contributed about $100,000, with the W.P.A. furnishing approximately $300,000.

Construction of the road was started soon after the adoption of the resolution. Some time before the end of 1941 a roadbed forty feet wide, consisting of a subbase with gravel pavement twenty-four feet in width, was completed. Although it was contemplated that a permanent black-top surface would be laid, the public was tacitly permitted to use the road some time in late 1941, and private vehicles were allowed to and did pass over the road in its partially finished condition. No doubt the intention was that the permanent surface would be applied in the Spring of 1942. Intervening events prevented this.

In December 1941 the Government instituted condemnation proceedings and obtained an order for immediate possession of some 920 acres of land to the east of the Raritan Arsenal so that the Arsenal might be enlarged for war purposes. The additional land acquired by the Government surrounded slightly over a mile of the Industrial Highway; however, the Government did not include the highway in the 1941 condemnation proceeding. In the Spring of 1942, the Federal Government closed off that portion of the highway which lay within the additional land acquired for the Arsenal in December 1941. This closing of the portion of the roadbed may have been a temporary arrangement required by wartime conditions or designed to protect the public from the dangers of the Arsenal. There is some evidence that the Government and the County so considered the closing. It was not until August 1946, some time after the end of the second World War, that the Government brought this condemnation proceeding and thereby eliminated the possibility of a reopening of the road to through traffic between State Street in Woodbridge and Woodbridge Avenue in Edison. Nevertheless, there could have been no more effective taking than that which occurred in the Spring of 1942 when the Federal Government closed and took possession of the highway. The possession of the Government has been continuous since that time and its control never diminished thereafter. The Spring of 1942 must be considered the date of taking for the purposes of this case.

The meadow lands to the east of the enlarged Arsenal have never been developed and the portion of the highway not taken by the Government was never permanently surfaced and has been abandoned by the County.

211

At the outset of the trial, the jurors inspected the present condition of the area involved in this proceeding as an aid to understanding the testimony of witnesses concerning the existing circumstances in 1941 and 1942. This testimony concerned public use of the Industrial Highway as a through road prior to and at the time when the mile portion of it was taken by the Federal Government in the Spring of 1942, which taking turned the remaining portion into a dead-end road. Naturally, no contention is made that the County was compelled to provide a substitute public access to the meadow lands. The only question is whether there was a reasonable necessity in the Spring of 1942 for the County to construct another by-pass around the Fords section for through traffic.

Early in the trial the Government, laying much stress upon the language of the resolution adopted in 1941 by the Middlesex County Board of Chosen Freeholders, took the position that since the purpose of the Industrial Highway was to facilitate and enlarge industrial development of the meadow lands, the road was not constructed for through traffic between its terminal points, and that consequently its closing could not require the County to construct a substitute through road. Such argument, however, does not take cognizance of the fact that the County may have been stating only its most appealing purpose in order to secure W.P.A. funds for the improvement, and that, even though the road was undertaken for one purpose, use by the public for another purpose might compel the County to provide a substitute road upon elimination of the facility.

Testimony as to the use of the Industrial Highway was provided by fourteen witnesses. The testimony was conflicting, although it certainly seemed that each witness was endeavoring to give his honest recollection of events that occurred more than a decade ago. On the one hand, from the testimony of some witnesses it might be concluded that though the gravel road was never formally opened, the public was allowed to drive its entire length in the late summer or early fall of 1941, the road being in such condition as to permit speeds of 35 to 40 miles per hour; that there was considerable public traffic on the highway as the road served as a direct route for intrastate and interstate traffic which otherwise would be forced to flow through the Fords section of Woodbridge Township and the intersection of King George's Road and New Brunswick Avenue, which intersection for several years prior to 1941 had been considered a traffic bottleneck; and that after the road was opened to the public, the burden of traffic in the Fords section was somewhat lessened. A traffic expert testified that by relating back to 1941 and 1942 a survey made in 1954, he would estimate that approximately 1,000 vehicles per day would have traversed the Industrial Highway, except that some persons may have been deterred by the lack of a permanent surface. On the other hand, some witnesses testified that there were never more than a small number of vehicles per day which used the road; that while the road was passable and may have relieved traffic on other roads to some extent, it was difficult to make any estimate of the amount of traffic in the limited period during which the road was open to the public; and that the road was not used very much, largely because few people knew of its existence or that it had been opened to the public generally.

There was also testimony that the Board of Chosen Freeholders had, for the last several years prior to trial, actively considered the construction of a road to replace the Industrial Highway although no formal action had been taken because of a lack of available funds.

The County and the Government both called witnesses to testify as to the nature and extent of highway facilities which might be constructed as substitutes for the taking by the Government of a portion of the Industrial Highway. All of the proposals were directed at affording a by-pass for through traffic around the Fords section. The most

costly proposal consisted of a replacement road of a mile and a third running from Smith Street northwesterly to Woodbridge Avenue, north of the Raritan Arsenal. The point at which this proposed road would terminate at Woodbridge Avenue was about a mile and a half north of the terminal point of the Industrial Highway, and it was suggested that Woodbridge Avenue be widened for this distance. The estimated cost as of 1942 of constructing the new road with sub-base and gravel and widening the portion of Woodbridge Avenue was approximately $380,000. The least expensive proposal involved making use of the uncondemned portion of the Industrial Highway on the easterly side of the Arsenal, connecting it by a new road with King George's Road southwest of the Fords section. Although this might necessitate a widening of King George's Road between the connection of the new road and Woodbridge Avenue, the proposal would provide a by-pass around that section and at the same time make the maximum use of existing roads, thus minimizing the amount and cost of road construction.

At the conclusion of the evidence presented by the County, the Government moved for a directed verdict. The Government contended that the evidence presented by the County was insufficient to support a jury finding that any substitute highway facilities were reasonably necessitated by the closing of the Industrial Highway. The Government further urged that the undisputed facts were so closely parallel to State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33, certiorari denied 1954, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679, as to require a directed verdict that no substitute facilities were necessary. In the State of Washington case, the undisputed facts were that in 1943 the Government established a major atomic energy project in a sparsely settled area on the Columbia River, closed all roads within the bounds of the project to the general public and moved all residents of the three towns within the project area, leaving only employees of the Government and its contractors. One of the roads closed was a twenty-eight mile portion of a secondary highway which traversed the project area. The primary function of the highway had been to provide access to the three towns now within the project from which the public was excluded. The highway also provided the shortest route between certain towns lying outside of the project, but alternate facilities existed in the form of primary highways the use of which required longer trips in miles but not in time inasmuch as the substitute roads were better and did not involve a ferry crossing of the Columbia River. The State of Washington contended that a substitute for the road taken was necessary as a part of the state highway system to carry traffic between the terminal points of that road both for intrastate and interstate traffic. The trial court set aside a verdict for the State on the ground that there was not sufficient evidence to support the State's claim. The Ninth Circuit Court of Appeals affirmed, pointing out that the primary need for the highway as an access facility had been eliminated, that at best the evidence of use by intrastate and interstate traffic was minimal, that existing alternate facilities could clearly handle such traffic adequately, and that the opinion testimony of the State's experts not based upon evidence must be disregarded.

The evidence presented in the State of Washington case, however, differs in several respects from that in the instant case. Here there is evidence from which a jury might find that an important function of the Industrial Highway was to provide not merely access to the meadow lands through which it ran but to alleviate traffic on other roads, that there was considerable use of the Industrial Highway by through traffic and that the closing of the road had an adverse effect upon the utility of existing alternate facilities. For these reasons the motion of the Government under Rule 50 was denied. The jury returned a verdict for the County for $172,000. It must be con-

cluded that the jury found that there was a necessity for the construction of a substitute road.

■■ The Government's motion for a new trial under Rules 50 and 59 raises the question of whether the verdict of the jury is against the weight of the evidence. Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147. In reviewing the evidence for the purposes of this motion the trial court is not limited to taking that view of the evidence which is most favorable to the County, but is required to review and weigh the evidence and all relevant factors, and the mere fact that there may be evidence to support the County's claim does not mean that a new trial must be denied if the Court believes that right and justice have not been done. Magee v. General Motors Corp., 3 Cir., 1954, 213 F.2d 899.

■ Upon consideration of the motion for a new trial, a question arose as to effect on this case of a provision of Rule 71A of the Federal Rules of Civil Procedure which governs the procedure in condemnation cases. Although the rule was promulgated in 1951, some six years after this case was instituted, it is nevertheless applicable. 71 S.Ct. CXXII. (April 30, 1951); United States v. 76.15 Acres of Land, etc., D.C.N.D. Cal.1952, 103 F.Supp. 478. It was by virtue of this rule that the Government secured a jury trial. Prior to 1951 the general practice in condemnation cases was to have compensation determined by commissioners. Paragraph (h) of Rule 71A reads as follows:

"(h) Trial. If the action involves the exercise of the power of eminent domain under the law of the United States, any tribunal specially constituted by an Act of Congress governing the case for the trial of the issue of just compensation shall be the tribunal for the determination of that issue; but if there is no such specially constituted tribunal any party may have *a trial by jury of the issue of just compensation* by filing a demand therefor within the time allowed for answer or within such further time as the court may fix, unless the court in its discretion orders that, because of the character, location, or quantity of the property to be condemned, or for other reasons in the interest of justice, the issue of compensation shall be determined by a commission of three persons appointed ·by it. If a commission is appointed it shall have the powers of a master provided in subdivision (c) of Rule 53 and proceedings before it shall be governed by the provisions of paragraphs (1) and (2) of subdivision (d) of Rule 53. Its action and report shall be determined by a majority and its findings and report shall have the effect, and be dealt with by the court in accordance with the practice, prescribed in paragraph (2) of subdivision (e) of Rule 53. *Trial of all issues shall otherwise be by the court.*" (Emphasis supplied.)

This paragraph distinguishes between (1) the determination of the issue of just compensation and (2) the trial of other issues. When a jury trial is demanded the issue of just compensation is resolved by the jury but all other issues are tried by the court. As already pointed out, when the subject of the taking is a road or highway, the affected governmental unit is entitled to no more than nominal damages unless it can establish that the construction of a substitute facility in some form is necessary. When applied to the instant jury case, Rule 71A(h) suggests the question whether the existence of a reasonable necessity for the construction of substitute highway facilities is a part of the "issue of just compensation" so as to make it a matter for jury determination. If this question was raised or considered in the State of Washington or City of Fort Worth cases there is nothing in the opinions that so indicates. Those cases seem to have proceeded on the assumption that the determination of a reasonable necessity was a jury question. Counsel for the County and for

the Government believe that the phrase "issue of just compensation" should not be interpreted as meaning that the jury's function is to be restricted solely to the dollar amount of the award. After consideration, I have reached the conclusion that the issue of necessity was properly submitted to the jury. In the average condemnation proceeding, many factors must be considered in arriving at just compensation, factors which are only established and available after the exercise of a fact-finding process. There appears to be no reason for introducing a trial by jury into condemnation proceedings unless the jury's province is broad enough to include the weighing of evidence which directly relates to the issue of compensation. It would seem that in this case the determination as to whether any substitute facilities are required at all is indeed a part of the "issue of just compensation", one of the factors to be taken into account by the jury in reaching its verdict. Should the jury find that no new facilities were required, then its award would, pursuant to the court's instructions, be limited to nominal damages.

■ On the testimony presented, I cannot conclude that the verdict of the jury was against the weight of the evidence or that the result is unjust either on the matter of whether substitute facilities were reasonably necessary or on the cost of the construction of appropriate facilities.

For the reasons already given, the Government's motions for judgment and for a new trial are both denied.

The County does not complain of the amount awarded by the jury as the cost of providing substitute highway facilities for the portion of the Industrial Highway taken by the Government. The County does contend that it is entitled to 6% interest on the award of $172,000 from April 1942, the date of the taking.

■ Interest can be recovered against the Government only by reason of agreement, statute or constitutional right. Albrecht v. United States, 1947, 329 U.S. 599, 67 S.Ct. 606, 91 L.Ed. 532; United States v. Thayer-West Point Hotel Co., 1947, 329 U.S. 585, 588, 67 S.Ct. 398, 91 L.Ed. 521; Boston Sand Co. v. United States, 1928, 278 U.S. 41, 47, 49 S.Ct. 52, 73 L.Ed. 170; Seaboard Air Line Railway Co. v. United States, 1923, 261 U.S. 299, 43 S.Ct. 354, 67 L. Ed. 664.

The petition in condemnation which instituted this proceeding stated that the right of eminent domain was exercised under 26 Stat. 316 as amended by 40 Stat. 241 and 40 Stat. 518, 50 U.S.C.A. § 171 and under 54 Stat. 712, 50 U.S.C.A. Appendix, § 1171. These statutes make no provision for the payment of interest.

■ The Fifth Amendment of the United States Constitution provides that property shall not be taken by the Federal Government for public use without "just compensation". It has been held that this provision requires the payment of interest in condemnation cases whenever interest is necessary to provide "just compensation." As said in the Seaboard Air Line Railway case:

"Just compensation is provided for by the Constitution and the right to it cannot be taken away by statute. Its ascertainment is a judicial function. Monongahela Navigation Co. v. United States, 148 U.S. 312, 327, 13 S.Ct. 622, 37 L.Ed. 463.

"The compensation to which the owner is entitled is the full and perfect equivalent of the property taken. Monongahela Navigation Co. v. United States, 148 U.S. 312, 327, 13 S.Ct. 622, 37 L.Ed. 463. *It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken.* United States v. Rogers, 8 Cir., 257 F. 397, 400. *He is entitled to the damages inflicted by the taking.* Northern Pacific Ry. Co. v. North American Telegraph Co., 8 Cir., 230 F. 347,

352, L.R.A.1916E, 572, and cases there cited.

"The United States in effect claims that the owner is entitled to no more than the value of the land, as of the date of taking, to be paid at a later time, when ascertained. The owner has been deprived of the land and its use since the taking, May 23, 1919." 261 U.S. at page 304, 43 S.Ct. at page 356. (Emphasis supplied.)

and further:

"The requirement that 'just compensation' shall be paid is comprehensive and includes all elements and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation. Where the United States condemns and takes possession of land before ascertaining or paying compensation, the owner is not limited to the value of the property at the time of the taking; he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking. Interest at a proper rate is a good measure by which to ascertain the amount so to be added." 261 U.S. at page 306, 43 S.Ct. at page 356.

The whole theory of including interest as a part of just compensation comes down to the language emphasized above: the owner of property which is taken under the power of eminent domain is entitled to be put in as good position pecuniarily as if his property had not been taken. Surely, where the subject of the taking is property of value in that it is capable of producing income or could be sold and the proceeds so employed, there can be no question but that if the property is taken today and its present worth is not paid until the termination of a condemnation proceeding ten years from now the owner will not receive just compensation, for in addition to the taking he has been deprived of the use of the property or its equivalent for ten years. It is essential to add something in order to compensate for the deprivation and to arrive at just compensation. Interest has become the accustomed additional ingredient. Albrecht v. United States, 1947, 329 U.S. 599, 603, 67 S.Ct. 606, 91 L.Ed. 532.

In the instant case the property taken, a portion of a public road, has no such value. The only loss to the owner, the County of Middlesex, is that it must provide a substitute road. Thus, the County has lost nothing by the deprivation here involved; in fact, the County has been relieved of the burden of maintaining the road for fourteen years. In this case the County did not proceed to construct a substitute highway and then seek reimbursement. See United States v. 1,433 Acres of Land, etc., D.C.D.Kan. 1947, 71 F.Supp. 854.

The County cites road condemnation cases in which interest was allowed. United States v. Des Moines County, Iowa, 8 Cir., 1945, 148 F.2d 448; Town of Bedford v. United States, 1 Cir., 1927, 23 F.2d 453. But it does not appear that the question of whether interest was proper was raised in any of these cases.

To grant the County interest of close to $150,000 on top of the award of $172,-000 for the construction of substitute highway facilities would seem inequitable as grossly in excess of just compensation.

In receiving the cost of substitute facilities the County is, in the opinion of this Court, being given just compensation for the taking involved.

An order may be presented in conformity with the foregoing conclusions.