**UNITED STATES of America, Petitioner-Plaintiff,**

v.

**51.8 ACRES OF LAND, ETC., IN the TOWN OF HEMPSTEAD, COUNTY OF NASSAU, State of NEW YORK, and The People of the State of New York, et al., Defendants.**

**C. P. No. 100.**

United States District Court
E. D. New York.

May 22, 1957.

See also 147 F.Supp. 356.

632

Harry T. Dolan, Sp. Asst. to the Atty. Gen., for petitioner-plaintiff.

G. Frank Dougherty, New York City, for defendant, by John P. McGrath, Jeremiah M. Evarts and Martin H. Proyect, New York City, of counsel.

INCH, Chief Judge.

This action was commenced on September 26, 1955, to acquire approximately 51.8 acres of land in the Town of Hempstead, New York, adjoining the U. S. Airfield known as "Mitchel Field", and within 450 to 750 feet of the ends of two of its principal runways. The land was unimproved by buildings or structures and in itself had no road or street frontage. The plot was irregular in shape and was acquired with other land by the State from the Meadowbrook Club in May 1953 and September 1954 for a consideration which computed at $6,000 per acre.

For brevity and to avoid confusion, the defendants State of New York and Jones Beach State Parkway Authority will be referred to as "State" and the United States of America, plaintiff, as "Government". The material facts pertinent to this acquisition and the questions presented are not in dispute.

At the time of the taking and valuation (September 27, 1955), and at the time this action was commenced, the entire parcel was encumbered by certain easements granted to the Government by the State on September 30, 1954 (Govt. Exhs. 5, 13), and restricted as to future use by restrictive covenants running with the land, as imposed by a contract between the State and the Government on January 4, 1954. (Def. Exh. J.) The effect of the easements and restrictions upon the utility and future use of the land for any and all purposes for which it would be normally suitable and available, if unencumbered, and the price which would be paid for land so encumbered, represents the critical questions presented and the basic dispute between the parties.

It was established that on September 30, 1954, the State granted the Government a so-called "avigation easement" affecting and encumbering this entire parcel, as well as adjoining lands of the State to the east and south. (Govt. Exhs. 8, 9–13.) This easement, as well as the restrictive covenants as to future use imposed on these lands by contract of January 4, 1954, were granted and imposed in exchange for easements granted the State by the Government for highway purposes through approximately 54 acres of Government-owned land constituting a part of Mitchel Air Base. (Govt. Exhs. 3, 8, 9.)

The avigation easement granted the Government an easement over all of this land "for the free and unobstructed passage of aircraft through the airspace above the portions of clear zones, runway approach surfaces, and transitional surfaces * * * situated over the lands so affected and related to the Northwest-southeast, East-west and Northeast-southwest runways of Mitchel Air Force Base. (Govt. Exhs. 8, 9, 11, 13.) The easement further provided that the State would, at its cost and expense, to the extent required by the Commander, Mitchel Air Force Base, clear and keep clear the land encumbered by the easement "from any and all obstructions infringing upon or extending into the clear zones, runway approach surfaces or transitional zones, situated over the aforesaid easement acres, including the removal of trees or brush and further including the demolition and removal of buildings or any other structures or obstructions infringing upon or extending into or above said portions of the zones or surfaces, whether located on or extending over the said lands described above". The lands encumbered by this easement included approximately 200 acres of land purchased by the State from Meadowbrook Club in April 1953 and September 1954 and included all of the parcel under consideration.

It was established that approximately 23.9 acres of the parcel under consideration were situated in the clear zones to

the Northeast-southwest and East-west runways of Mitchel Field Air Base and the remaining 27.9 acres in the approach zone to the Northeast-southwest runway. (Govt. Exh. 9.) It further appears that a considerable area of State land adjoining on the south lies within the clear zone of the East-west runway and approximately 30 acres lie in the approach zone to said runway. (Govt. Exh. 9.)

It was further established that the airspace encumbered by the easement and so restricted as to use by the State, within that portion of the clear zones in the area condemned (approximately 23.9 acres), was that immediately adjacent to the land and extending upward without limitation; whereas, the airspace affected by the easement in the approach zone (approximately 27.9 acres) inclined from the land surface to a maximum height of 25 feet at the easterly boundary of the parcel. (Govt. Exhs. 10, 11.) The variable height of the plane surface above the land in the approach zone results from the variable surface elevation of the land in relation to the incline of the approach plane or surface. (Govt. Exh. 10.) It would appear that the same approximate situation prevails over the lands of the State adjoining on the south, which lie in the clear and approach zones of the East-west runway.

The obvious purpose of such an easement is to prevent flight hazards both to Government personnel and property engaged in air flights over this land, as well as to public property and civilians. The ultimate object of such easements, whether acquired by exchange, purchase or appropriation, is to vest in the Government or preempt the absolute and unrestricted use of the airspace over and above the plane surfaces constituting the clear, approach and transitional zones of established or projected runways of airfields.

It should be apparent that it is the abnormal, rather than the normal flight of aircraft approaching or taking off from runways, which avigation easements of this character are chiefly designed to protect and when, because of mechanical difficulties, wind or weather conditions or errors of judgment, the normal flight pattern cannot be maintained. Under such circumstances, it is necessary that the lower reaches of the airspace in the clear and approach zones be restricted and kept clear of obstructions for such emergencies and it is for such purposes that such easements are acquired by condemnation or otherwise. The avigation easement granted by State of New York to the Government is distinguishable from the avigation easements involved in United States v. 48.10 Acres of Land, D.C.S.D.N.Y.1956, 144 F.Supp. 258; United States v. 4.43 Acres of Land, D.C., 137 F.Supp. 567, in that the avigation easement here involved granted to the Government the "right of flight" of aircraft within the airspace defined in the easement as well as prohibited any obstructions within such areas; whereas, the avigation easements involved in the cases above cited only prohibited obstructions within such airspace. The other distinguishing feature between the instant easement and the easement condemned in the above entitled actions is that the cost of removing obstructions or keeping the airspace clear of obstructions is here assumed by the State or its successors in title, whereas in the cases cited this obligation was assumed by the Government.

It is obvious that such easements, no matter how acquired, depreciate the land value in direct proportion to the impairment of its utility or availability for use resulting therefrom. United States v. Causby, 1946, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; United States v. 26.07 Acres of Land, More or Less, in Town of Hempstead, D.C.E.D. N.Y.1954, 126 F.Supp. 374; United States v. 48.10 Acres, supra, cf. United States v. 72.35 Acres of Land, D.C.E.D. N.Y.1957, 150 F.Supp. 271. In view of the established fact that the plane surface throughout the clear zone is at ground level and that in the approach zone the plane varies from zero to 25' above ground level and entirely overlays the entire land surface, it would appear

that the utility and value of this land to any prospective purchaser, for any conceivable use, has been severely impaired, if not totally destroyed.

The land under consideration, as of the date of taking, was further encumbered as to utility and use by the restrictive covenants contained in the agreement of January 4, 1954, between the State and the Government. (Def. Exh. J.) Under paragraph (e) of said agreement, it was provided that the clear zone areas could be sealed off from the State's remaining lands by security fences. In paragraph (f), the State agreed to convey to the Government a perpetual easement for a right-of-way approximately 20' wide for the construction of a storm drain outfall sewer. This easement was granted on September 30, 1954 (Govt. Exh. 5) and extends through the center of the lands condemned from its westerly to its easterly boundaries. (Govt. Exh. 6.) This easement includes the right to construct, operate and maintain a storm water drainage pipe line under and through the land under consideration. Under paragraph (h) of said agreement, no construction could be accomplished or structures erected within the area condemned. Under Paragraph (3) of said agreement it was provided that all the provisions of the agreement "shall at all times be deemed to be, and should be, continuing covenants running with the land" and "binding upon the grantees, successors or assignees of the Authority and the People of the State of New York". (Def. Exh. J.)

██ It should be apparent that if the Government were here acquiring by condemnation the rights and interest in this land, which it had already acquired through negotiations, conveyances and contract and in exchange for making available to the State 54 acres of its airfield for the parkway, that it would be required to pay to the State just compensation measured by the loss in "market value" of this land, attributable to the loss of its future utility and resulting from the encumbrances so imposed. Such has been the judicial pattern and precedents established in the cases heretofore cited. Experience has demonstrated that such claims frequently approximate the full fee value of the land so encumbered even though the future utility is but slightly affected. United States v. 26.07 Acres of Land, More or Less in Town of Hempstead, supra; cf. United States v. 72.35 Acres of Land, supra; United States v. 48.10 Acres of Land, supra.

The State, without disputing or contesting the factual situation presented by the encumbrances on the land existing at the date of taking, contends that, despite these encumbrances and restrictions of the use of the land surface and adjacent airspace, the land had the same value for "park use" after the encumbrances were imposed as before and that a considerable area of the land lying within the clear and approach zones could be used for a public golf course. The State contended that golfers playing golf on the land within the clear and approach zones, even though they would intrude into the restricted airspace permanently and exclusively reserved by the avigation easement for the free and unobstructed passage of aircraft, would not constitute flight hazards or violate the restriction against "any and all obstructions". I have had many years' experience in playing golf and the uses of land for golf courses and I cannot subscribe to the State's contention in this regard. To my mind, a golfer can and would constitute as great or a greater flight hazard and obstruction in clear and approach zones as a bush, tree or brush growing on the land and extending into the airspace reserved for the unobstructed flight of aircraft. The State further contends that the value of the land as encumbered on the date of taking should be valued for "park use" by the State and that the "market value" principle of valuation in condemnation should be rejected, because the land was acquired and held under legislative authority for parks and parkways. I know of no legal precedent for such a novel concept or distinction, and under the circumstances here presented, I should hes-

itate to adopt it if such a precedent existed. Westchester County Park Commission v. United States, 2 Cir., 1944, 143 F.2d 688, certiorari denied 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583. Cf. State of Nebraska v. United States, 8 Cir., 1947, 164 F.2d 866, 869, certiorari denied 1948, 334 U.S. 815, 68 S.Ct. 1070, 92 L.Ed. 1745; United States v. 2.02 Acres of Land, More or Less, Situate in City of New Rochelle, D.C.S.D.N.Y.1943, 51 F. Supp. 56, affirmed Westchester County Park Comm. v. U. S., 2 Cir., 143 F.2d 688; United States v. Certain Land in Town of Highlands, D.C.S.D.N.Y.1944, 57 F.Supp. 96.

■ The only departure from the "market value" concept of just compensation in condemnation proceedings, with which I am familiar, involved taking of portions of existing public highways, streets, utility lines and facilities of that character, where the "cost of substitute facilities" required or needed to perform the functions involved was substituted for the "market value" doctrine. Mayor and City Council of City of Baltimore v. United States, 4 Cir., 1954, 147 F.2d 786; United States v. Des Moines County, 8 Cir., 1945, 148 F.2d 448, 160 A.L.R. 953, certiorari denied 326 U.S. 743, 66 S.Ct. 56, 90 L.Ed. 444; United States v. City of New York, 2 Cir., 1948, 168 F.2d 387; United States v. 25.4 Acres of Land, D.C.E.D.N.Y.1947, 71 F.Supp. 255; United States v. Certain Lands, D.C.D. N.J.1956, 144 F.Supp. 206; State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33.

■ The suggested principle of valuation advanced by the State, if under any circumstances applicable, has the following infirmities: The land under consideration is park land only in the sense that it was acquired under legislative authority for park and parkway purposes. Very little, and none of the land under consideration, was actually acquired for such purposes from the Meadowbrook Club. This particular land and considerable of the remaining lands to the east and south were not required for its parkway, but were acquired from Meadowbrook Club at the express insistence of the Government and in order to encumber it for the benefit of the Government in the manner heretofore outlined and in exchange for a grant of easement through Government-owned land. The land involved has never been used for public park, golf or recreational purposes. On the date of taking, the legislature had already empowered the Parkway Authority to sell, exchange or otherwise dispose of this land or any of its real property not necessary for its corporate purposes. (Def. Exh. I.) The State's proof as to value, both unencumbered and as encumbered, was related to and based upon the "market value" of comparable land in the neighborhood, suitable, available and purchased for residential subdivision for homesites and as reflecting the prices paid for such comparable land between willing buyers and sellers in the open market. The State desires the court to value this land as "unencumbered" on the basis of "market value" and as "encumbered" on the basis of "park value", and with no depreciation attributable to the encumbrances.

■ The proposed method of valuation of this land by the State would clearly violate the time-honored principle that land condemned cannot be valued on the basis of its special adaptability or unique value to the owner or to the taker. Such considerations must be disregarded and the value established as between a willing buyer and a willing seller for all available uses and purposes for which the land is suitable and adaptable. United States v. Miller, 1943, 317 U.S. 369, 375, 63 S.Ct. 276, 87 L.Ed. 336; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L. Ed. 1236.

Of course, all land of any comparable size has value for public park or recreational use, if not so encumbered as to destroy such uses, but market value is nevertheless the only acceptable criterion for measuring this value. The State contended that if use as a golf course were prohibited by the easement restrictions, the land had a value of $10,500 per

acre for other conceivable recreational purposes. It is difficult to visualize any recreational activities of the public which would be permissible in the clear zone area, or in that part of the approach zones where the airspace was restricted and reserved for the flight of aircraft down to a 6-foot elevation above the land. If there is any distinction between "market value" and "public park value" in fixing just compensation in a federal condemnation proceeding, I am not aware of the distinction, nor is there in my mind any practical or legal distinction.

 If land is suitable and available for public park use or public recreational activities, its value must be determined by the prevailing prices being paid for comparable land in the area, for which a market and demand exist for residential, commercial or industrial use. By the same token, if land devoted to public park or recreational activities were to be sold or condemned the same measure of valuation would obtain. If land had been devoted to public park or recreational use and facilities had been erected or constructed on the land for such uses and such land were the subject of sale or condemnation, the value of the improvements, if any, would be determined by the amount which they enhanced the land value. If the prevailing demand and market for such land was for residential, commercial or industrial use, it is probable that such improvements would add nothing to the market value of the land for such prevailing uses, and in fact might detract from such value on account of the cost of demolition and removal.

The State concedes that for residential use, the easements and restrictive covenants "substantially" depreciated the value of this land on the date of taking. In view of the fact that no buildings or structures could be erected on any part of the lands involved, as hereinbefore indicated, the land would obviously have no value for such use.

It is the Government's contention that the value of the rights it acquired in this property from the State by easements and restrictive covenants, in exchange for easements granted to the State, was the approximate equivalent of the full fee value. The Government contends that approximately 43.9 acres of this land was left with no remaining market value, being the area where the airspace was restricted and reserved down to an elevation of 6 feet above the land, and that in the remaining 17.9 acres, where the elevation of the easement in the airspace inclined from 6' to 25', the remaining market value did not exceed 20% of the unencumbered fee value of $9,000 per acre. It appears evident to me that land without adequate control and use of the adjacent airspace must necessarily have a very limited value and such value must be measured largely by the extent of the airspace that can be controlled and utilized in conjunction with the surface rights.

We have a comparable but reverse situation presented in connection with the easement granted the State by the Government. (Govt. Exhs. 3 and 9, Parcels A, B, C.) Here the State exclusively controls the surface of the land and the immediately adjacent airspace, but the Government still retains the fee title. It could not be fairly contended that this fee has any residual value or utility, as so encumbered. It can be assumed that this 54 acres of Government land and the 51.8 acres of State land, if unencumbered, would have comparable market value per acre.

 The State has placed considerable emphasis on the fact that the Government leased from the State in November 1954 for a nominal consideration, the land here involved, together with adjoining lands to the south for military recreational purposes and, at its expense, improvised and used a part of the old Meadowbrook Golf Course. (Def. Exh. M.) This, it is contended, demonstrates the availability and value of this land for golf course or recreational use. It appears that the land involved in the lease lies largely within the clear and approach zones of two runways and entirely re-

stricted by the avigation easement of September 30, 1954. (Govt. Exhs. 4, 7, 8.) I consider that this contention and this fact are without legal significance, since the Government, being the beneficiary of the easement could, if it chose, use the surface of the land leased from the State in violation of its rights under the easement. It is unwarranted to assume that a purchaser from the State could make the same use of the land in violation of the Government's rights under the easement, and I know of no authority which supports the State's suggestion in this regard.

A claim is asserted for the total loss of 2½ holes of the old course located within the area of the taking, based upon estimated costs to replace them new and damage from the severance of 5½ additional holes. These claims are without factual or legal substantiation or justification and are totally rejected and disallowed. These so-called "indirect damage claims" are predicated upon the assumption that the value of this land should be based on golf course use, which I hold to be inconsistent with and in violation of the restrictions imposed on the land. To use the lands condemned in conjunction with the State's remaining lands to the south for golf course purposes, as previously indicated, would violate the Air Force criteria specified in the avigation easement encumbering this land, and the State or any successor in title could be denied such a use. It is further held that the highest market value of this land on the date of taking, if unencumbered by the easements and restrictive covenants herein referred to, and for which any conceivable demand and market existed or could be anticipated in the reasonably near future, was for residential subdivision under existing zoning or for industrial development, if a change in zoning could be effected to permit such use.

I wish to observe that I am thoroughly familiar with this land and have been for many years. Within the past few weeks I heard and decided a condemnation action involving 50.8 acres, adjoining the subject property on the north and very similar and comparable in all physical aspects,—except encumbrances. United States v. 50.8 Acres of Land, D.C.1957, 149 F.Supp. 749.

It is clear to me from the proof submitted that if this land, on the date of taking, were free of these encumbrances, it would have had a market value of $10,-000 per acre. It is clear to me that that value has been totally lost as to that portion of the land lying within the clear zones (approximately 23.9 acres); that as to approximately 10 acres lying within the approach zone, where any obstruction, other than a building or structure, would be permitted within the clearance limitation of zero to 6', the market value would not exceed 10% of the unencumbered fee value, and that in the remaining area of 17.9 acres lying in the approach zone, where the clearance limitation ranges from 6' to 25', the encumbered value would not exceed 20% of the unencumbered fee value. It must be noted, however, that no structures or buildings could be erected on any part of the land and that the cost and obligation to keep the land free of other obstructions within the limitations imposed would rest on the State or its successors in title. Any purchaser from the State would also have to assume and pay all taxes and assessments levied on the land. It is conceivable, and I assume that some use could be made of part of the land lying within the approach zone and I assume that a purchaser could be found who would pay the value indicated. The sales relied on by the State were not of golf course or recreational lands or lands encumbered by easements, such as are presented here, and are of no assistance to the court except to establish the market value of the land as though unencumbered.

In summary, it is found that the land on the date of taking was encumbered and restricted as to use and future utility as follows: (a) the entire area was encumbered by the avigation easement of September 30, 1954 (Govt. Exh. 13), which granted the free and unobstructed

flight of aircraft within the adjacent and lower elevations of the airspace, as hereinbefore described. (b) The entire area of the land was restricted as to any obstruction of whatsoever nature in the clear zone area (23.9 acres), and which might intrude into the clearance surface in the approach zone (zero to 25'), comprising the remaining 27.9 acres. (c) No buildings or structures could be erected within the entire area. (d) The cost of removing obstructions and/or keeping the area clear of obstructions was assumed by the State or its successor in title. (e) All taxes or assessments levied on the land were obligations assumed by the State or its successor in title. (f) The clear zone area (23.9 acres) could be sealed off by a security fence, at State expense, from the State's remaining lands. (g) The central portion of the tract was subject to a permanent drainage pipe line easement extending from the westerly to the easterly boundaries. (h) All the covenants in the agreement of January 4, 1954 (Def. Exh. J) were deemed to be covenants running with the land and binding on the State or its grantees, successors or assigns. It is difficult to conceive of land more severely encumbered and restricted as to future utility or where the market value has been more adversely impaired.

The Government withdraws any objection or opposition to defendant's Exhibits N, O, P, Q, and these exhibits are received in evidence and have been considered in connection with this decision.

I find and determine that the just compensation which should be paid by the Government to be as follows:

| | | |
|---|---|---|
| 23.9 acres | | No Value |
| 10 acres—(10% of unencumbered fee value, or $1,000. per acre) | | $10,000. |
| 17.9 acres—(20% of unencumbered fee value, or $2,000. per acre) | | 35,800. |
| Total Value and Just Compensation | | $45,800. |

Settle order.