32 C.C.P.A.(Patents)

## In re LOBOSCO.

### Patent Appeal No. 4923.

Court of Customs and Patent Appeals.
Dec. 11, 1944.

Charles C. Scheffler and Eugene L. Greenewald, both of New York City, (Donald C. Harrison, of New York City, of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (R. F. Whitehead, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the examiner rejecting seven claims (being all the claims) of an application relating, as stated in appellant's brief, "to a method and means for increasing the life of electrical contacts."

The claims are numbered 21 to 27, inclusive, 21, 22, 23, and 27 being drawn to the method and 24, 25, and 26 to the apparatus.

We quote the following general statement from the brief on behalf of appellant:

"When electrical contacts, and particularly metal contacts of the make-and-break type, are operated in a direct current circuit there is a gradual accretion of metal, or 'mounding', on one contact and a corresponding decrease, or 'pitting', from its mating contact. This phenomenon is most

familiarly encountered in the breaker points of an automobile ignition circuit where it is a minor source of annoyance, requiring occasional filing of the surfaces of the contacts and, rarely, installation of new contacts. In some other circuits, the problem is more serious; in a few, very serious indeed because imperfections in the contact surfaces result directly in a serious impairment of the functioning of apparatus involving the circuit. For instance, automatic machines for oxyacetylene cutting of metals require very accurate speed governors, one of the most suitable types of governor being an electrical-mechanical device involving make-and-break electrical contacts, and imperfections in the contact surfaces result in inaccurate operation of the governor and, consequently, inaccurate cutting of the metal plate.

"A simple expedient almost universally used to decrease the rate of mounding and pitting is to impede the sudden surges of electric current, caused by the opening and closing of the contacts, by a condenser and resistor connected across the contacts. This expedient decreases the intensity of arcing across the contacts and correspondingly increases the life of the contacts; but it by no means altogether prevents mounding and pitting.

\*    \*    \*    \*    \*

"The present invention provides a novel method and a novel means for automatically reversing the polarities of electrical contacts operating in a direct current circuit, and particularly in a circuit including a speed governor. Aside from novelty, the invention enjoys the merits of simplicity, wide adaptability, reliability, and freedom from trouble or expense for maintenance."

A general description of the subject matter is given in the brief of the Solicitor for the Patent Office as follows:

"Appellant's application relates to a method and means for increasing the life of a pair of make and break contacts as used to control the flow of direct current to a speed governor for electric motors.

"It is stated in the specification that it was well known that the efficiency of such contacts and their useful life is decreased due to the formation of a mound on the positive contact and a corresponding pit on the negative contact during the operation of the governor. It was also known that this pitting could be practically eliminated by reversing, from time to time, the polarities of the two opposed contacts.

"Appellant proposes to effect this desired result by an arrangement in which the polarities are reversed only at intervals, i. e., when the current is restored to the motor by the closing of the previously opened line switch. This is accomplished by connecting an intermediate circuit between the line switch and the contact arms and containing an impulse step-by-step relay. This relay is operated by a coil responsive to the current passing from the input circuit and is such as to throw a set of contact arms from one position to another to change the direction of the flow of current through the make and break contacts every time the line switch is closed."

Drawings illustrate two device forms which are described in appellant's brief as follows:

"Two forms of this invention are shown respectively in Figures 1 and 2 of the drawing. Fig. 1 shows a wiring arrangement in which the direction of current through the entire motor or output circuit is changed when reversing the polarity of the contacts and the motor brushes. Fig. 2 shows a wiring arrangement wherein the polarity of the make-and-break contacts is reversed *without* reversing the direction of current flow through the motor.

"In both instances, the reversal of polarity of the contacts is effected by the double-pole double-throw switch arrangement actuated by an electrically energized coil 30 or 30' in the intermediate circuit."

Neither the examiner in his statement following the appeal to the board nor the latter in its decision discussed the limitations embraced in the claims in detail, from which we conclude that it was the view of those tribunals that the claims of the respective groups stand or fall together.

Claims 21 and 24 are quoted in the brief of the Solicitor for the Patent Office as illustrative. They read:

"Claim 21. A method of increasing the life of a pair of make-and-break contacts controlling the flow of direct current through an output circuit connected to an intermediate circuit, which comprises energizing said intermediate circuit with direct current and, in response to each such energization of said intermediate circuit, impressing a potential on said contacts and reversing the polarity of said contacts relative to the polarity thereof during the preceding energization of said intermediate circuit.

"Claim 24. In combination, an input circuit connected to a single source of direct current, a circuit including a pair of make-and-break contacts; an intermediate circuit; electrically operable means operatively associated with said intermediate circuit and connecting the latter to the circuit including said contacts; and switch means operable to connect said intermediate circuit to said input circuit to energize said intermediate circuit, said electrically operable means, and said circuit including said contacts with direct current; said electrically operable means operating, in response to each such energization, to reverse the polarity of said contacts relative to the polarity thereof during the preceding energization of the circuit including said contacts."

Appellant's brief states, in substance, that method claims 21 and 27 are generic to both forms of the claimed invention (claim 27 being dependent on claim 21); that claims 22 and 23 are specific to Figs. 1 and 2, respectively; that apparatus claim 24 is generic to both forms of the claimed invention, and that claims 25 and 26 are specific to Figs 1 and 2, respectively. While appellant analyzes each claim in detail emphasizing certain limitations, we do not understand that he contends that method claims 22 and 23 are patentable unless the generic claims of that group are found to be patentable, or that apparatus claims 25 and 26 are patentable unless claim 24 is found to be so. In this connection it may be said that the examiner first passed upon the apparatus claims and then in a short paragraph rejected the method claims on the same references, saying "* * * the alleged method is no more than the normal mode of operation of the apparatus and if the apparatus is unpatentable the method is likewise unpatentable."

The prior references cited by the examiner consist of the following patents: Hart 941,777 Nov. 30, 1909; Reuter et al. 1,064,-541 June 10, 1913; Swarthout 2,157,640 May 9, 1939; Avery 2,162,237 June 13, 1939.

The board expressed the opinion that the Swarthout and Avery patents are the most pertinent but concluded its decision with the statement "We consider the rejection sound for reasons more fully discussed by the examiner who refers to other references." So, all the references cited by the examiner remain in the case.

In the decision of the board it is said: "The rejected claims are concerned with a method and apparatus for increasing the life of a pair of make and break contacts controlling the energization of a direct current motor. This is provided by reversing the polarity of the contacts intermediate different energizations of the circuit. Appellant proposes this reversal to prevent the formation of pits and humps in the adjacent contacts during use of the switches."

The examiner in his discussion of the apparatus claims stated: "The apparatus disclosed in this application is an arrangement for reversing the current through a pair of contacts, specifically on a speed regulating governor for a motor each time the motor is started."

The subject matter presented is highly technical in character, and in the absence of any traverse by appellant of the accuracy of the description by the Patent Office experts of the device and of the prior art devices, we, as of course, accept such description in our consideration of the case.

The pertinent features disclosed in Fig. 1 of the drawing (we here paraphrase in part the examiner's statement) are a speed governor on which are make-and-break contacts (or brushes) which are in series with a motor and a reversing switch (or relay), a main switch which, when closed to operate the motor causes the reversing switch to be operated by its coil and thus the current is reversed through both the motor and the make-and-break contacts.

In Fig. 2 the motor is not connected through the reversing switch; hence in that arrangement the current is reversed only through the contacts.

We note that the specification states that the relay (that is the reversing switch, which is located in what is described as an intermediate circuit) "forms no part of the present invention and any suitable automatic reversing means having the desired operating characteristics may be used."

The examiner stated: "As pointed out in the specification as well as in the patents to Reuter et al, Swarthout and Avery it is desircable to reverse the current through frequently operated contacts to equalize the wear on them and to prevent pitting on one contact and building up of deposits on the other."

It was further said by the examiner: "Claims 24, 25 and 26 are drawn to an

arrangement including an electrically operable means operating in response to each energization of the apparatus to reverse the current at least through the contacts controlling the motor. This is the switch G [the relay] shown more in detail in Figs. 3, 4 and 5."

With respect to the prior art disclosures the examiner stated:

"In the apparatus shown by the reference to Avery a reversing switch is provided for reversing the current through the governor contacts. This switch is mechanically operated by a pawl and ratchet wheel and a linkage driven by the motor operated machine so that the current is reversed at intervals during the operation of the machine. It has been held that it would not amount to invention to substitute any suitable well known solenoid operated switch such as shown by the reference to Hart for the mechanically operated switch in the system shown by the reference to Avery or in actuating the reversing switch by a solenoid operated pawl and ratchet as shown by the reference to Hart rather than by a linkage as shown by the reference to Avery. Such an arrangement would obviously include an 'intermediate circuit' in the sense in which the term is used in the claims and would operate in response to each energization of that circuit to reverse the current through or the polarity of the contacts.

"The reference to Swarthout shows an arrangement in which a reversing switch is arranged directly on the motor shaft to reverse the current through the contacts during each revolution for the same purpose and the reference to Reuter et al shows a manually operated switch arranged to reverse the current through a pair of rapidly operated contacts each time the device is energized for the same purpose."

The board discussed the prior art and its application as follows (numerals and page citations omitted):

"The Swarthout and Avery patents are the most pertinent references. Both these references are concerned with the same problem. Swarthout reverses the direction of current flow thru contacts * * * during every half revolution. Avery provides a switch mechanism for the same purpose with 'actuating devices whereby the frequency of the reversals of the direction of current flow may, if desired, be reduced in number as compared with the number of initiations of the operation of a machine of which they form a part' * * *. Appellant urges that the reversal of the current as specified by Swarthout takes place too often to be efficient and on the other hand urges that the Avery reversals are haphazard and take place too seldom to be effective. If the result sought is accomplished by the patentees and there is no reason to assume that it is not accomplished, then we find no patentability in a regulation to reverse the current flow every time the operation of the motor is initiated.

"Appellant also calls attention to the fact that the operations of the switches in Avery and Swarthout are thru mechanical means rather than electrical means and the examiner has referred to Hart to show a solenoid operated device to reverse the flow of a current thru a circuit. Broadly, to provide an electrically operated device rather than a mechanical device for this purpose is lacking in invention."

It may be said here that the Hart patent apparently was cited for the purpose of showing that solenoid-operated switches are old (a fact conceded by appellant), and the Reuter et al. patent to show the disclosure of a manually operated switch arranged to reverse the current through a pair of rapidly operated contacts each time the device is energized.

In the brief for appellant the prior art references are analyzed in considerable detail, and the brief of the Solicitor for the Patent Office quoted different paragraphs from the specification of the Swarthout and Avery patents.

Appellant seems to challenge the accuracy of the examiner's holding to the effect that the substitution of the solenoid-operated switch of Avery would obviously include an "intermediate circuit." It is said "Avery is in fact without such an 'intermediate circuit' and to provide such a circuit in Avery would require the exercise of invention." Appellant also insists that it was improper to combine Avery and Hart as references.

The intermediate circuit defined in appellant's disclosure contains the relay, or reversing switch, which, as above quoted from the specification, is no part of the claimed invention. The circuit is located between and connected with an input circuit and an output circuit, and is stated, in

substance, to be energized by the flow of direct current from the input circuit. Appellant's brief states "The intermediate circuit, on receiving the current, conditions and impresses the current upon the output circuit so that the polarity of the contacts is reversed from what it was during the preceding energization."

So far as we can discern, the conditioning and impressing of the current so alluded to must be performed by the relay or reversing switch, concededly old in the art, and we are, therefore, unable to understand how the combination is rendered patentable by the inclusion therein of the intermediate circuit, which, it may be said, incidentally, is emphasized only in appellant's discussion of the method claims.

It should be noted that the examiner's exact statement is "Such an arrangement [substitution of the solenoid device of Hart for the linkage of Avery] would obviously include an 'intermediate circuit' *in the sense in which the term is used in the claims*" (italics supplied).

We are not convinced that the examiner's position on this feature of the case was erroneous, nor do we think it was error to combine the Avery and Hart devices as references.

It is noted that the board said: "Broadly, to provide an electrically operated device rather than a mechanical device for this [reversal of current flow] purpose is lacking in invention."

The holding so quoted is specifically covered by one of appellant's reasons of appeal and has received our careful study and consideration.

Standing alone, the holding might be too broad, but we do not understand that it was intended by the board to be a statement of an abstract principle generally applicable. It doubtless was a conclusion reached in the light of the known state of the art as depicted in the references and as conceded in appellant's specification.

When so considered, we do not feel justified in concluding that the board erred.

It is quite true that no one of the references discloses a specific apparatus such as that defined by appellant, and it is obvious that various features shown in the prior art would require modification in order to produce appellant's device, but it must be noted that none of the claims specifically distinguishes any structural feature from like pertinent features disclosed in the prior art, and we can find nothing in appellant's arrangement of parts to justify a holding that he has evolved a patentable combination.

This conclusion applies to both forms of apparatus shown in the drawings and described in the specification.

In view of our conclusion respecting the apparatus claims, it is unnecessary to discuss the method claims because they embrace nothing more than a recital of the operation of the apparatus.

The decision of the board is affirmed.

Affirmed.