255 F.2d 329
 UNITED STATES of America, Plaintiff-Appellee,
v.
JONES BEACH STATE PARKWAY AUTHORITY, 51.8 Acres of Land, More or Less, situate in the Town of Hempstead, Nassau County, State of New York, and Town of Hempstead, County of Nassau, The People of the State of New York and Unknown Owners, Defendants-Appellants.
 No. 222.
 Docket 24753.
 United States Court of Appeals Second Circuit.
 Argued March 13, 1958.
 Decided May 14, 1958.
 
 1
 Perry W. Morton, Asst. Atty. Gen., for appellee. Harry T. Dolan, Sp. Asst. to the Atty. Gen., of counsel; Roger P. Marquis, Edward S. Lazowska, Attys., Dept. of Justice, Washington, D. C., on the brief.
 
 
 2
 G. Frank Dougherty, New York City, for appellant, Jones Beach State Parkway Authority. John P. McGrath, New York City, of counsel; Jeremiah M. Evarts, Martin H. Proyect, New York City, on the brief.
 
 
 3
 Before CLARK, Chief Judge, HINCKS, Circuit Judge, and BRENNAN, District Judge.
 
 
 4
 BRENNAN, District Judge.
 
 
 5
 The appellant challenges on this appeal the principle of law upon which the value of the land, taken in condemnation, was determined and the amounts ultimately found to constitute just compensation therefor. The background of facts are set out in detail in the opinion below (United States v. 51.8 Acres of Land etc., D.C., 151 F.Supp. 631) and will be briefly referred to.
 
 
 6
 The lands involved constitute an irregular shaped parcel adjoining a United States Air Force facility located in the Town of Hempstead, N. Y. and generally known as Mitchel Field. The parcel is so located so as to embrace in whole or in part a prolongation of two of the principal runways of the existing installation. At the time of the taking, the lands were burdened with restrictive covenants imposed thereon and easements granted to the United States, designed to facilitate the use of Mitchel Field and to guard against accident and damage to aircraft and personnel from unforeseen accident in the use of said runways. By reason of the above restrictive provisions and easements, it may also be said that they were intended to avoid injury to persons who might be present upon the land and damage to property which might be located thereon. The evaluation of the lands, burdened as above, creates the problem involved in this litigation.
 
 
 7
 The owner of the fee of the lands taken is the Jones Beach State Parkway Authority, an agency of the State of New York, which, for convenience, will be referred to herein as the "State." The appellee will be referred to herein as the "Government."
 
 
 8
 A considerable portion of the trial record is taken up with evidence relative to the historical background of facts which brought about the imposition of the easements, above referred to. It is sufficient for our purpose to say that the easements under discussion were the result of negotiations between the State and the Government, beginning in 1952 and terminating in 1954. The negotiations were based upon the evident desire or necessity for both the State and the Government to obtain rights in or over certain property located in the vicinity of Mitchel Field. The State desired the right to locate a part of the highway, known as the Meadowbrook Highway Extension, over a portion of government-owned property. The Government desired to obtain interest in the property located on the east side of Mitchel Field which would provide additional protection to the runway approaches.
 
 
 9
 The negotiations terminated in a contract dated January 4, 1954, according to the terms of which the State was granted an easement to construct the highway, above mentioned, over approximately 54 acres of government property. The land in question (with other lands) was to be acquired by the State and burdened with the restrictions and easements, above referred to. The agreement was carried out according to its terms. An easement was granted by the Government, permitting the construction and maintenance of the Parkway Extension. The State purchased the lands in question from the Meadowbrook Club and, by the appropriate instruments, same was burdened in perpetuity with restrictive covenants, a drainage easement and an "avigation easement" for the benefit of the Government. The Government's rights in the lands involved here are stated below.
 
 
 10
 The avigation easement may best be described as providing for the uninterrupted flight of aircraft over what is termed a "clear zone" and an "approach zone." The clear zone embraced that part of the lands taken, adjacent to Mitchel Field and included in a rectangular area, in depth being a distance of 1000 feet, measured from the end of the runways and extending 750 feet on each side of the extended center line of the runway. This area comprised 23.9 acres of the total parcel. In effect, the use of the air space from the surface level and extending upward without limitation over the clear area was granted to the Government.
 
 
 11
 The remaining 27.9 acres of land taken was located entirely within the approach zone. The approach zone represented a defined area adjacent to that side of the clear zone which was farthest distant from Mitchel Field. The easement granted provided for the free and unobstructed passage of aircraft through the air space above it. The course of such passage began at the land level at the point where the clear zone joined the approach zone and rose generally from zero to 25 feet at the edge of the parcel farthest from the limits of Mitchel Field. The flight angle or glide path inclined upward one foot vertically for each 50 feet horizontally.
 
 
 12
 Unquestioned on this appeal is a summary of the court below of the encumbrances and restrictions as to the use and future utility of the lands taken, as follows:
 
 
 13
 "(a) the entire area was encumbered by the avigation easement of September 30, 1954 (Govt.Exh. 13), which granted the free and unobstructed flight of aircraft within the adjacent and lower elevations of the airspace, as hereinbefore described. (b) The entire area of the land was restricted as to any obstruction of whatsoever nature in the clear zone area (23.9 acres), and which might intrude into the clearance surface in the approach zone (zero to 25'), comprising the remaining 27.9 acres. (c) No buildings or structures could be erected within the entire area. (d) The cost of removing obstructions and/or keeping the area clear of obstructions was assumed by the State or its successor in title. (e) All taxes or assessments levied on the land were obligations assumed by the State or its successor in title. (f) The clear zone area (23.9 acres) could be sealed off by a security fense, at State expense, from the State's remaining lands. (g) The central portion of the tract was subject to a permanent drainage pipe line easement extending from the westerly to the easterly boundaries. (h) All the covenants in the agreement of January 4, 1954 (Def.Exh. J) were deemed to be covenants running with the land and binding on the State or its grantees, successors or assigns."
 
 
 14
 The determination of "just compensation," as required by the Fifth Amendment was made by the Court after the receipt of evidence. The evidence offered by both parties was directed to show (a) the fair market value of the lands taken, considering same as unencumbered by the easements and (b) the percentage by which the unencumbered valuation was reduced or depreciated by reason of said existing restrictions and easements. The owner's pecuniary loss, representing the market value of the premises, was thereby determined.
 
 
 15
 The testimony of the expert witnesses as to valuation produced no significant disagreement. The witnesses for the State placed the valuation at $10,500 per acre. The Government witness testified as to a valuation of $9,000 per acre. The Court found that the unencumbered valuation of the land was $10,000 per acre. The witnesses for both litigants based their testimony on comparable sales of property, zoned for residential purposes, in the vicinity of the area involved. Although the State's witnesses indicate that such valuation represented a value for park purposes, it is plain that both parties recognized that residential purposes was the highest and most profitable use for which the property was adaptable.
 
 
 16
 The matter of the depreciating effect of the burdens, imposed upon the value of the lands condemned, is the crux of the controversy here. The State's witnesses in substance testified that they in no way depreciated the value of the lands taken. The Government's witness testified to the effect that over half of the lands were depreciated so as to have no market value and that the remaining portion was depreciated by 80% of its unencumbered value by reason thereof. The contention is stated by the Court below as follows: "The State desires the court to value this land as `unencumbered' on the basis of `market value' and as `encumbered' on the basis of `park value', and with no depreciation attributable to the encumbrances." (151 F.Supp. 631, at page 636.) The trial court rejected the contention and refused to hold that under the circumstances, shown here, market value and park value were capable of actual distinction. Reference is made however in the Court below that in determining the effect of the easement any valuable use of the land was considered. The Court states at pages 634-635 "* * it would appear that the utility and value of this land to any prospective purchaser, for any conceivable use, has been severely impaired, if not totally destroyed." (Emphasis supplied.)
 
 
 17
 The legal concept of market value for the highest and best use of the property condemned is the generally accepted measure of just compensation. United States v. Miller, 317 U.S. 369, at page 374, 63 S.Ct. 276, at page 280, 87 L.Ed. 336. An additional value to the owner, because of the use to which his land is devoted, is not generally recognized as an element of market value. United States v. Petty Motor Co., 327 U.S. 372, 373, at page 377, 66 S.Ct. 596, at page 599, 90 L.Ed. 729; Olson v. United States, 292 U.S. 246, at page 255, 54 S.Ct. 704, at page 708, 78 L.Ed. 1236. That the above principles are not inflexible is recognized. United States v. Miller, supra. It is described in State of Nebraska v. U. S., 8 Cir., 164 F.2d 866, at page 869 as a rule that is not "autocratically absolute." The concept is flexible enough to lend itself to adaptation to the circumstances of a particular case in order to determine the money value of what the "owner has lost." Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, at page 195, 30 S. Ct. 459, at page 460, 54 L.Ed. 725. Familiar examples are the taking of public highway, utility facilities and leasehold interests. The New York Court of Appeals in St. Agnes Cemetery v. State of New York., 3 N.Y.2d 37, 163 N.Y.S.2d 655 held that under the circumstances existing that land restricted to cemetery uses should be valued for that use since it was the highest and best use of the property taken. This decision is not a variation of the rule but is rather a reiteration of the highest and best use doctrine with an evaluation based upon such use. In fact, this court in Westchester County Park Commission v. U. S., 2 Cir., 143 F.2d 688, certiorari denied 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583, intimated that the best use evaluation might apply to park lands under certain circumstances supported by evidence of a higher value by reason of restriction to park purposes.
 
 
 18
 The State's contention that the lands here must be evaluated upon the basis of the restricted use thereof for park purposes fails for the same reasons a similar contention failed in the Westchester Commission case. There is no evidence here that the highest and best use of the property is for park purposes. The State's own evidence of value disputes the contention. No separate value of the lands for park purposes was proved. In fact, residential use and comparable sales of property zoned for residential purposes were the bases of all expert testimony. In the above particular, the Westchester Commission case is stronger than the case here.
 
 
 19
 The actual grievance of the State on this appeal is not directed to the unencumbered valuation of the property but it is directed to the contention that the depreciation allowed by reason of the easements and restrictions should have been applied to the lands considered as dedicated to park purposes. A short answer is that there was no evidence of valuation of the land for park purposes as such, from which the depreciation due to the easements and restrictions could be deducted. If we look further into the record, we find that the lands were not considered essential for park purposes and not held by the State as such since authority for their sale had been granted and an offer to sell same to the Government at a sum very much lower than their unencumbered value had been made.
 
 
 20
 Finally a reading of the opinion below shows that the trial court did consider the availability of the encumbered lands for park and recreational purposes. Likewise the expert witness for the Government in his testimony evaluated the depreciating effect of the restrictions and easements as applied to lands used for both residential and park purposes. The Westchester Commission case is again more favorable to the State since such evidence was lacking therein. The Court in that case rejected a contention similar to that advanced by the State here. The record permits no different result.
 
 
 21
 The ultimate findings of value made by the trial court are not lightly open to reappraisal on appeal. Federal Rules of Civil Procedure, rules 71 and 52, 28 U.S.C.A. Even if we would have arrived at a different result, based upon the trial record, we may not substitute our judgment for that of the trier of the facts in the absence of clear error. We find none here. Substantial evidence, supporting the findings, is found in the record, the opinion indicates considered appraisal and application thereof, the award is within the range of the evidence, the result is therefore not open to attack. Phillips v. U. S., 2 Cir., 148 F.2d 714; United States v. Lambert, 2 Cir., 146 F.2d 469; United States v. Delano Park Homes, 2 Cir., 146 F.2d 473.
 
 
 22
 The claim for severance damages has not been overlooked. It arises by reason of the fact that two holes of a nine hole golf course were located within the clear zone area. The use of that area was so completely foreclosed by encumbrances, especially the provision for sealing off that area by a security fence, as to render the claim without basis.
 
 
 23
 Affirmed.