**UNITED STATES of America, Plaintiff-Appellee,**

v.

**The MEADOW BROOK CLUB, Defendant-Appellant.**

**No. 195, Docket 24691.**

United States Court of Appeals
Second Circuit.

Argued April 17, 1958.

Decided Aug. 6, 1958.

Certiorari Denied Dec. 15, 1958.

See 79 S.Ct. 290.

John H. Finn, New York City (Frederick Weisbrod, William C. Mattison, and Richard P. Charles, of Corner, Weisbrod, Froeb & Charles, Brooklyn, N. Y., on the brief), for defendant-appellant.

Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., and Harry T. Dolan, Sp. Asst. to Atty. Gen., on the brief), for plaintiff-appellee.

Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.

CLARK, Chief Judge.

This appeal by a property owner in a condemnation proceeding questions the adequacy of the compensation awarded by the court for land taken by the United States. The central issue concerns the alleged failure of the trial court to evaluate the property for industrial rather than residential use. The property in question consists of an interior tract of 48.8 acres of land without frontage on any major street located adjacent to Mitchel Air Force Base in the Town of Hempstead on Long Island. Originally it was part of the grounds of the Meadow Brook Club, which for many years provided private facilities for golf and polo competition at this location. On October 18, 1954, the United States filed a complaint in condemnation and the district court ordered the immediate delivery of possession to the United States of 70.5 acres of land belonging to Meadow Brook for use in connection with the proposed enlargement of the airfield. Eleven months later, on September 26, 1955, two parcels were eliminated from the proceeding and returned to Meadow Brook. The United States filed a declaration of taking to the remaining 48.8 acres and deposited in the court $417,830 as estimated compensation for the tract. 40 U.S.C. § 258a-e.

Prior to 1953, when the Club was in full operation, all its property consisted of some 326 acres. In 1953, however, under threat of condemnation, it sold 160 acres at $6,000 per acre to the Jones Beach State Parkway Authority for a proposed extension to the Meadowbrook State Parkway. This price to some extent reflected the promise of the Authority not to oppose efforts by Meadow Brook to have its remaining property zoned for industrial use. The Board of Directors of Meadow Brook then apparently concluded to move the Club elsewhere and to sell the remaining portions of the old site. Later in that year Meadow Brook sold 42 acres to the Old Country Trotting Association for $650,000, or approximately $15,500 per acre, for eventual use in connection with Roosevelt Raceway. This parcel, located to the north of the land now under consideration across a major street, Stewart Avenue, was especially valuable to the buyer, as it formed a corner of the Roosevelt Raceway property. In the same year Meadow Brook began negotiations for the sale of additional acreage to the Parkway Authority. This culminated in a sale in September 1954, again at $6,000 per acre.

The remaining land consisted of some 72 or 73 acres which, for descriptive purposes, can be conveniently divided into three parcels. The largest of these consisted of some 55.8 acres bordered roughly on the west, south, and southwest by Mitchel Field, on the east by Meadowbrook State Parkway, and on the north by the tracks of the Long Island Railroad which are located a good distance south of Stewart Avenue.[1] The major portion of this parcel is involved in this proceeding. The next parcel in

---

1. Actually the land south of this parcel belonged to the Jones Beach State Parkway Authority, but the United States also condemned it for use in connection with the air force base. See United States v. 51.8 Acres of Land, D.C.E.D. N.Y., 151 F.Supp. 631, affirmed United States v. Jones Beach State Parkway Authority, 2 Cir., 255 F.2d 329.

size consisted of a rectangular area of some 12.5 acres in size located between the railroad tracks and Stewart Avenue. This parcel, together with 7 acres of the larger parcel which were located south of and fronting on the railroad tracks, was eliminated from the taking; and the court awarded Meadow Brook $13,592 for use and occupancy of this area during the period between the filing of the complaint (and the original order of possession) and the declaration of taking. The third parcel, some 4.5 acres in area which has never been part of the condemned area, was located to the east of Meadowbrook State Parkway and fronted on Merrick Avenue, a well used local road which intersects with Stewart Avenue. It was eventually sold to Granick Company, Inc., some six months after the complaint was filed in this proceeding.

Prior to the sale of the 160 acres to the Parkway Authority all of the Club's property was zoned for residential use. But when it became obvious that the Club would have to move its operations, its Board of Directors decided to petition for a change of the zoning classification of the remaining property (the three parcels described above) to industrial use in order to realize higher prices on sale. Evidence established at the trial showed that an industrial classification was consistent with the surrounding area, which for some years gradually had been becoming an industrial area. To this end Meadow Brook filed a petition with the Town Board of the Town of Hempstead in May 1954, but hearings on the proposed change were adjourned until the following September. When the matter was finally heard on September 14, 1954, the air force, an adjoining landowner, objected to the rezoning and the Board reserved decision urging the parties to adjust the matter if possible. Before any further action was taken by the Board, however, this proceeding was begun. Thus at the time of the taking the property was zoned for residential use only.

At the trial Meadow Brook sought to establish the value of the tract as industrial property. Its experts testified on the basis of sales of industrial property in the vicinity and estimated that prior to the taking the entire remaining property, excluding the 4.5 acres fronting on Merrick Avenue, was worth $2,174,-000; that after the taking the 19.5 acres severed from the original area and still in the hands of Meadow Brook were worth $640,000; and that the difference, $1,534,000, represented $70,000 in severance damages (or $10,000 an acre for the severed portion south of the railroad tracks) and $1,464,000 (or $30,000 an acre) as the value of the condemned 48.8 acres. On the other hand, the expert who testified for the United States valued the property as residential and concluded that it was worth $414,800 (or some $8,500 per acre). He relied on a number of sales involving substantial acreage, including the two sales by Meadow Brook to the Parkway Authority at $6,000 per acre and other sales which indicated values between $7,000 and $11,500 per acre. The court, D.C.E.D.N.Y., 149 F.Supp. 749, 753, after considering "the zoning restrictions on use as they existed and the possibility or probability of a change to industrial use in the reasonably near future, in the light of all the testimony presented," valued the 48.8 acres at $488,000 (or $10,000 per acre).[2]

Just compensation compatible with the requirements of the Fifth Amendment is the fair market value of the condemned property just prior to the taking. United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390;

2. The court properly sought to take into consideration "[t]o what extent the possibility or probability of a change [in zoning] would affect the value as of the date of taking" and stated only the obvious when it said that such effect "is dependent upon the degree of probability, the imminence of the change, the effectiveness of the opposition, and other factors which are largely speculative and conjectural." D.C.E.D.N.Y., 149 F.Supp. 749, 752.

United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205. This evaluation should reflect not only the purpose for which the property has theretofore been used, but other uses which might render it more profitable. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 709, 78 L.Ed. 1236. It would be improper to value the property as if it were actually being used for the more valuable purpose. But the "extent that the prospect of demand for such use affects the market value while the property is privately held" should enter into the calculation. Olson v. United States, supra, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236. Obviously the more profitable operation must be one allowed by law to be carried out on the premises. Thus if existing zoning restrictions preclude a more profitable use, ordinarily such use should not be considered in the evaluation. Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, certiorari denied 323 U.S. 726, 65 S.Ct 59, 89 L.Ed. 583. On the other hand if there is a reasonable possibility that the zoning classification will be changed, this possibility should be considered in arriving at the proper value. This element, too, must be considered in terms of the extent to which the "possibility" would have affected the price which a willing buyer would have offered for the property just prior to the taking. The court below stated that it applied these principles in arriving at its decision. There is nothing in the record to support Meadow Brook's intimation that the judge did not carry out in good faith his own expressed intent. Thus we conclude that the court applied the correct legal principles to reach its result. United States v. Certain Parcels of Land in City of Philadelphia, 3 Cir., 215 F.2d 140.

Meadow Brook contends that in any event the rules stated above have no application to this situation. It claims that the property should have been valued as if it had already been rezoned for industrial use at the time of the taking because of the alleged imminence of such rezoning. Its theory is that but for the opposition of the air force before the Town Board the property undoubtedly would have been rezoned, thus allowing more profitable use. In support of this argument it points to the many parcels in the surrounding area which have been rezoned, including the tracts sold by it to the Old Country Trotting Association and Granick Company, Inc., its 12.5-acre parcel north of the condemned land, and other areas in the near vicinity. But this argument depends on the motive which led the air force to oppose Meadow Brook's application before the Board. Clearly the United States, like any adjoining landowner, was a proper party to resist rezoning. Meadow Brook realized this when it took as part consideration for the sale of acreage to the Jones Beach State Parkway Authority the latter's agreement not to resist the Club's efforts to rezone the remaining property. If the air force had a proper motive, this well might have precluded rezoning at any time. Thus if the height of proposed factories or the congestion attendant on industrial concentration would have created undue flight hazards for the nearby runways, it is possible—in fact probable—that the property never would have been rezoned had a taking not occurred. Cf. United States v. Delano Park Homes, 2 Cir., 146 F.2d 473. But it is also clear that if the government's sole motive in resisting the change in zoning was to depress the market value of the property which it then intended to condemn, the court's estimate of the probability of rezoning (as a factor entering into the ultimate calculation of value) should not have reflected this opposition. In re Inwood Hill Park, 230 App.Div. 41, 243 N.Y.S. 63, affirmed 256 N.Y. 556, 177 N.E. 138. See also Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463. The record, however, fails to support Meadow Brook's charge of bad faith;

and the court's finding that the government's opposition was based in large part on the fear of flight hazards finds ample support in the evidence.[3] Thus to arrive at the fair market value at the time of the taking the court had to consider the probability that the air force would eventually withdraw its opposition and that the Town Board would otherwise grant Meadow Brook's petition. On the record we cannot say that the court failed properly to take all of these factors into account.

■ In the light of the court's proper treatment of the effect of the zoning restrictions on the property, it is apparent that there is substantial evidence in the record to support the court's valuations. This was an interior plot, with no direct access to nearby roads. It was large and irregular, bounded on three sides by Mitchel Field. Certainly this proximity detracted from its value for residential or industrial purposes, especially in the light of the probable restrictions which would have been imposed because of the increased air activity. Although Meadow Brook through its experts introduced evidence relating to the value of nearby property used for industrial purposes, most of these tracts were not comparable to the one involved here. In addition to being located further from the airfield, most of them were smaller in size and had direct access to adjacent roads. On the other hand, evidence introduced by the United States indicated a value lower than that settled upon by the court.[4]

■ Meadow Brook also raises a number of specific objections relating to the admission and exclusion of certain items of evidence which we shall deal with briefly. The most important one was the exclusion of evidence of the sale by Meadow Brook of its 4.5-acre tract to Granick Company, Inc. This sale occurred in March 1955, some six months after the filing of the complaint, for a price of $85,000. Probably it would have been wiser for the court to have admitted this evidence. Cf., e.g., United States v. 63.04 Acres of Land, 2 Cir., 245 F.2d 140, with its later holding, 2 Cir., 257 F.2d 68. But we find no prejudicial error in its exclusion, for this parcel was substantially unlike the condemned land. First, it was much smaller in size and fronted on Merrick Avenue. Second, its price reflected industrial use, for the sales contract made the transaction contingent on a change in zoning from residential to industrial. Third, the sale occurred well after the crucial date of the government's taking possession. United States v. Dow, 357 U.S. 17, 78 S.Ct. 1039, 2 L. Ed.2d 1109.

■ Meadow Brook's next objection is to the admission of evidence concerning the sale by it of adjacent property to the Parkway Authority for $6,000 per acre. It contends that this evidence was irrelevant, because these were forced sales made under threat of condemna-

<hr>

3. The charge of bad faith was never made below. It depends in large part on inferences which Meadow Brook seeks to draw from letters and statements by various air force officials. But this evidence is consistent with the existence of proper motives for the opposition. In addition it is almost impossible to garner much meaning from the fact that the air force later consented to the rezoning of nearby parcels for industrial use. These were smaller parcels located further from the busy runways than the property now under consideration, and numerous factors not apparent on the record could account for their different treatment.

4. As a final—and new—point made in a reply brief, Meadow Brook urges that the Jones Beach case, supra note 1, showed an agreed-upon and found value for adjacent land for residential use and shorn of its burdensome avigation easements of $10,000 per acre. Meadow Brook's argument is that its land must be worth much more in view of the possibility of rezoning for industrial use. But were we tempted to go outside the record here because of fear of a diverse result on a different record, there would be too many unanswered questions to make comparison at all apt. These include questions as to the actual extent of the previous holding, the effect of the there later time of taking in view of the rising market, the relative location and ease of access of the plots, and so on.

tion. There is nothing in the court's opinion which indicates that it gave controlling weight to these sales; and we would be hesitant to rule that a court, sitting without a jury, committed any sort of error in admitting and considering such evidence for what it is worth. This is especially true because Meadow Brook's president testified as to facts which allegedly accounted for the depressed price. Moreover, it is quite ridiculous to contend, as does Meadow Brook, that the government's appraiser should have ignored such sales in reaching his conclusion as to the worth of the remaining land. Obviously this is a relevant factor which he should have taken into consideration. United States v. Delano Park Homes, supra, 2 Cir., 146 F.2d 473.

■ Next Meadow Brook claims that the court erroneously considered as an admission against interest a letter offered in evidence by the Club which contained a statement that it had been offered up to $1,000,000 for its property. It has been said that offers to buy the condemned tract (unlike offers to sell) are not probative evidence of land value in a condemnation proceeding. Sharp v. United States, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211. Whatever be the rule here, there is no indication that the court considered this letter as independent evidence of value. In any event the statement certainly was relevant to check the credibility of Meadow Brook's experts, who valued a lesser portion of the property at more than twice the amount stated in the communication.

■ Lastly, Meadow Brook objects to the court's failure to award severance damages and to the alleged inadequacy of the compensation for use and occupancy of the severed parcels. We find no error in either of the court's conclusions. Meadow Brook offered nothing persuasive to show that the 7-acre tract was less valuable as a separate parcel than it was as part of the larger area. Neither before nor after the severance did this tract have direct access to nearby roads. And the decrease in size, for all we are told, might have enhanced, rather than decreased, its value. As to compensation for use and occupancy, Meadow Brook takes no exception to the formula applied by the court, but only to the land value to which the formula was applied. But here, as before, the evidence adequately supports the court's conclusion as to value. Meadow Brook's final point, that the court's findings were inadequate, is without merit. The decision adequately sets forth the essential facts upon which its conclusions are based. And unlike the findings in United States v. Bobinski, 2 Cir., 244 F.2d 299, these show without ambiguity the method which the court employed in reaching its valuations. See United States v. Bobinski, 2 Cir., 254 F.2d 686. In the simple and uncomplicated federal practice there is no provision for cross-examining a judge upon his decision through the guise of making him pass upon draft findings; suggestions from counsel as to findings are limited to aiding, not harassing, the court. Consequently Meadow Brook's separate appeal from the order denying its motion for some fifty-one additional findings is particularly fruitless.

In this appeal, as in other similar ones lately before us, the vigorous attack upon the trial judge's fairness leads to a request for a trial *de novo*. We find here some ambiguity, since replacement of the judge is not directly sought and obviously so unusual an appellate interference with normal calendar control should be had only for the strongest of reasons. Yet, realistically viewed, a judge so thoroughly imbued as is Chief Judge Inch with all phases of this vast governmental project cannot be expected to disabuse his mind of all he has learned so as actually to start quite anew. As we see it, there is no proper occasion for calling for so futile a course; at most there should be only a remand for further proceedings as in the Bobinski case, supra; and see United States v. 63.04 Acres of Land, supra, 2 Cir., 245 F.2d 140, eventually

affirmed 2 Cir., 257 F.2d 68. But actually in all cases filed to date we have affirmed, finding the hearings and results fair and sound. See also United States v. Jones Beach State Parkway Authority, 2 Cir., 255 F.2d 329, and United States v. Fox, 2 Cir., 257 F.2d 805. Judge Inch's vast experience in this type of action has undoubtedly served him well to win such uniform approval from critical appellate eyes in so onerous a series of cases.

Judgment affirmed.

LUMBARD, Circuit Judge (dissenting).

In my opinion, four errors and the attendant misconceptions on the part of the trial judge deprived the defendants of a fair trial on the issue of fair compensation for the land condemned. Accordingly, I vote to reverse and remand for a de novo trial.

First, the district judge failed to give sufficient weight to the overwhelming likelihood that the Meadow Brook land would have been rezoned for industrial use had not the Air Force opposed the Meadow Brook application for rezoning. Indeed the only opposition to such rezoning at the hearing held on September 14, 1954 before the Town Board of the Town of Hempstead was that of the United States Air Force itself. The government's proposed findings of fact summarized the position of the Air Force as stated at this hearing by Brigadier General Condon representing the Mitchel Air Base Commandant and the Head Engineer of the Air Base thus:

"* * * they both outlined to the Town Board the basis of the Government's opposition to the change in zoning, which involved flight hazards and safety factors, as well as the fact that the property or a portion thereof was the subject of pending proposed acquisition for the expansion of the Air Base and that the change of zoning would be inimical to the military defense. (Def. Exhs. "A", "E" and "I".) As a result of the hearing, the Board reserved decision on the application for change. (Def. Exh. "A".)"

The district judge recited that the change from residential to industrial zoning did not occur until November 1956. His opinion treated rezoning merely as a possibility.

It is quite obvious that the district judge gave no weight to the fact that only the opposition of the Air Force prevented the rezoning two years prior to November 1956 and that this opposition was based on the unspecified claim that "the change of zoning would be inimical to the military defense."

It is difficult for me to escape the conclusion that the Air Force opposed the rezoning principally in order to keep down the price of this land which they then knew they were about to condemn by this action which was commenced a few weeks later on October 18, 1954. This is virtually admitted by Major General Asensio in a letter he wrote to the Town Board on September 28, 1954, wherein he stated that the Meadow Brook petition to rezone "was inimical to the interests of national defense inasmuch as action was even then in progress toward acquisition of the area in question for expansion of the Mitchel Air Force Base." He further stated that "action toward acquisition of this property has proceeded through the essential preliminary phases of Congressional and Presidential authorization and appropriation. Under the Meadow Brook's application for rezoning to industrial use, the maximum height of any building on the property would be limited to thirty-five feet. The restriction on height under the residential zoning was forty-five feet. On being apprised of this, Major General Asensio, Vice-Commander of the Continental Air Command and Brigadier General Condon's superior, advised the Town Board of Hempstead that "In view of the lesser hazard presented by the proposed rezoning, no objection on specific grounds could be taken by representa-

tives of this command, provided that the 35 ft. limitation for height of structures were specifically incorporated in any amendment to the Building Zone Ordinance." Thus, it is apparent that the rezoning would not have produced any real "flight hazards" or impaired "safety factors." Consequently the rezoning was "inimical" to the government's interest only because it might increase the market value of the land to be condemned.

While it may have been proper for the Air Force to oppose rezoning in order to keep down the price, it was error for the district judge to completely disregard the fact that it was only the action of the prospective condemner itself which postponed rezoning for industrial use. That the government seeks by such means to profit at the expense of its citizens seems to me to be unconscionable. To thus permit the government to profit by its own opposition is manifestly unjust.

Thus while the district court opinion deals merely with the "possibility" of rezoning, the fact is that rezoning was at that time a virtual certainty postponed merely by the action of the Air Force. The area surrounding the Meadow Brook property had completely changed from residential to industrial use even before Meadow Brook first applied for rezoning in May 1954. These surrounding properties had been rezoned, including other land of Meadow Brook. Some twenty industrial plants had already sprung up nearby in the few years after World War II, including those of such companies as Arma Corporation, Macy Shopping Center, Sperry Gyroscope Co., Roosevelt Raceway, Fairchild Engine and Airplane Corp., Pepsi-cola Bottling Co., All Metal Screw Products, Airborne Instrument Laboratory, and Grummann Aircraft Corporation.[1]

The government's expert based his valuation exclusively on residential use

and to his figures the district judge apparently added approximately 20% to reach the round figure of $10,000 per acre. On the other hand, the experts called by Meadow Brook gave considerable weight to the industrial use of the land in the light of the rapid industrialization of the area. In view of the record it seems to me that the district judge erred by giving little or no weight to the probable industrial use.

Second, it was error to exclude evidence of sales subsequent to October 18, 1954, the date of the order of possession, merely because the sales were subsequent to that date. United States v. 63.04 acres, supra. Thus it was error to exclude the contract of sale dated March 25, 1955 whereby Meadow Brook agreed to sell Granick Company, Inc. 4.5 acres on Merrick Avenue and the Hempstead Turnpike for $85,000. The land was conveyed later that year and was ultimately rezoned for industrial use. It is patently absurd to receive evidence of sales occurring almost five years before the order of possession and yet exclude evidence of a sale of contiguous land only five months later. This parcel was part of the land embraced in the Meadow Brook rezoning petition and it lay entirely within the approach zone of one of the Mitchel Field runways.

Thirdly, the district judge erroneously treated as evidence of value an offer to purchase 72.8 acres of Meadow Brook property which included the condemned land, for "upwards of $1,000,000," although at the trial neither party contended that this was any evidence of value. Indeed the exhibit containing the "evidence" was not offered for that purpose.

The evidence of the offer to purchase appears in a letter written to the Hempstead Town Board on October 1, 1954 by counsel for Meadow Brook which recited

---

1. From the record it is clear that Meadow Brook had decided on rezoning and the sale of its lands in 1953 after the State of New York had condemned some of its lands and before there had been any intimation of possible condemnation by the United States.

the reasons why counsel had refused a request of the Air Force to take no further steps to rezone. The first reason was "That at the present time my client has a definite offer to sell the lands sought to be rezoned for a sum of upwards of $1,000,000." The letter gave the name and address of the prospective purchaser. This letter was part of the file of the Town Board, most of which was received in evidence, not for the purpose of establishing the value of the land or any part of it, but to bring before the court the facts regarding the petition to rezone and the opposition of the Air Force.

An offer to buy is not evidence of value, as the government now concedes in its brief. See Sharp v. United States, 1903, 191 U.S. 341, 348, 24 S.Ct. 114, 48 L.Ed. 211. But in the district court the government submitted findings of fact, Number 10 of which read:

"10. It appears from the defendant's proof that on or about October 1, 1954, after the application for change in zoning and within eighteen days prior to the date of taking herein, the defendant had a bonafide offer of approximately $1,000,000. for the 72.8 acres involved in the application for a change in zoning, which would be at the rate of $13,736. per acre. (Def. Exh. "H".)"

The proposed findings submitted by the defendant properly made no reference to the offer for the land.

Although the district judge never did pass on the proposed findings submitted by both parties, and in fact declined to do so, although he had requested that findings be submitted, the government's suggestion found its way into the court's opinion in the following language:

"It appears that the owner, at the time of taking and at the time of its petition for a change of zoning, had pending from a large developer a bona fide offer to purchase its remaining lands of approximately 72.8 acres for upwards of $1,000,000 or approximately $13,736 per acre average. * * * This sale was apparently contingent upon a change to industrial zoning and was never consummated." United States v. 50.8 Acres of Land, etc., D.C., 149 F.Supp. 749, 752.

It should be noted that nowhere in the record does it appear how much "upwards of $1,000,000" the offer was. Nor was there any proof that the offer was contingent upon rezoning as the opinion stated. The only facts before the district judge regarding the offer were the statements of counsel quoted above from his letter to the Town Board.

My brothers seek to excuse the use of the letter by arguing that "the statement was relevant to check the credibility of Meadow Brook's experts." But the record shows the letter was not so used as the experts were never asked about the letter. Even if the letter had been so used it would bear only on the credibility of the experts and it would not be evidence of value.

Thus the court was misled into using an indefinite statement of an offer, not submitted as proof of value, and not proper evidence in any event, and from this offer it was argued that the value must be something less than the approximate amount of the offer. In my opinion it cannot seriously be questioned that this error was highly prejudicial to a proper consideration of the fair value of the land.

Fourth, the district judge allowed no damages for severance of a 7 acre plot. No reasons were given for this action. From the record it would seem that the isolation of these seven acres probably meant that they must be sold together, rather than as part of the larger plot which could be divided into the requisite $4\frac{1}{2}$ acre parcels for industrial use. If this be so it would seem that some damage had thereby been suffered and the court should have made allowance therefor.

Lastly, I think the district judge erred in not adequately stating the bases for

his decision. United States v. Bobinski, supra. Indeed what Chief Judge Clark wrote in that case at page 302 of 244 F. 2d applies with equal force here:

"We have somewhat more difficulty with the district court's substituted conclusions as to land value, since they are not accompanied by findings as detailed as those of the commissioners and are less susceptible to careful review on appeal. Appellants submit a table to show that the trial court's figures are with one minor exception precisely 20 per cent higher than the highest valuation set by a Government witness. Whether or not this was the trial court's method of finding valuation and on what grounds it may be justified do not appear from the opinion below; and accordingly we must vacate the trial court judgment and remand for more detailed findings. We are not holding that its figures are wrong, only that as yet they are not supported by adequate findings."

Here the court had requested counsel to submit findings, and although both parties submitted detailed findings the court failed to pass upon them.

Formal findings of fact and conclusions of law are not required in every case. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. But, here, where the opinion of the court is hardly more than a compilation of conclusions, it seems to me that formal findings of fact should have been made to supplement the opinion so that the parties and this Court could be informed of the bases on which the District Court rested its decision. See Life Savers Corp. v. Curtiss Candy Co., 7 Cir., 1950, 182 F.2d 4. Cf. United States v. Forness, 2 Cir., 1942, 125 F.2d 928, 942, certiorari denied City of Salamanca v. U. S., 316 U. S. 694, 62 S.Ct. 1293, 86 L.Ed 1764.

Because of these patent errors, I would reverse and remand for a trial *de novo*.

