346 F.2d 690
 UNITED STATES of America, Petitioner-Plaintiff-Appellee,
v.
CERTAIN LAND IN the BOROUGH OF BROOKLYN, COUNTY OF KINGS,
CITY AND STATE OF NEW YORK, and the City of New
York, Defendant-Appellant.
 No. 364, Docket 29215.
 United States Court of Appeals Second Circuit.
 Argued March 16, 1965.
June 9, 1965.
 
 Richard N. Counties, Atty., Dept. of Justice (J. Edward Williams, Acting Asst. Atty. Gen., Harry T. Dolan, Sp. Asst. to Atty. Gen., Brooklyn, N.Y., Roger P. Marquis, Atty., Dept. of Justice, on the brief), for appellee.
 Robert D. Joyce, New York City (Leo A. Larkin, Corp. Counsel for City of New York, on the brief, George Newman, New York City, of counsel), for appellant.
 Before LUMBARD, Chief Judge, and MOORE and MARSHALL, Circuit Judges.
 MOORE, Circuit Judge.
 
 
 1
 The City of New York (the City) appeals from a judgment in a land condemnation proceeding which fixed 'just compensation' to be paid to the City by the United States in the amount of $41,250. The case involves principles of eminent domain. Here an addition to a federal post office building and a city public school playground are vying for occupancy of the same area. Although the City recognizes that federal domain is the more eminent, it asserts that the compensation awarded for this privilege is grossly inadequate.
 
 
 2
 In 1959 the City (by way of the Board of Education) decided to build a new public school in the Williamsburg section of Brooklyn. The site eventually chosen covered 55,000 square feet (s. f.). A United States Post Office Building was adjacent to the south side of the land. In addition to the school, the land was needed for a playground (construction of a schoolhouse in New York City without an open air playground being unlawful, N.Y.Education L. 2556(5)) which was to be run by the Parks Department on a seven-day basis.
 
 
 3
 One need not be very familiar with the Williamsburg section to know that 100,000 s.f. of vacant land are not easily found. Consequently, the City instituted a condemnation proceeding in late January 1960 to acquire the 29 parcels covered by the needed tract. These parcels were mostly the typical 25' by 100' lot, although two-- the largest-- were 100' by 100'. All were improved, mostly in a technical sense, to judge from the photographs, with a rather dilapidated assortment of septuagenarian shops, flats, and garages. For all the property so taken, the City was ordered by judgment of the Supreme Court of the State of New York to pay $700,390 exclusive of interest.
 
 
 4
 The City then closed Cook Street, which cut across near the middle of the property, demolished the improvements, and proceeded to build the school. The City's plans were then thwarted when on December 3, 1962, after the school building was well on its way, the Government filed a declaration of taking with respect to 15,000 s.f. of the 30,000 s.f. south of what had been Cook St. The Post Office had decided to expand its building and needed land immediately adjacent to it. In addition to the 15,000 s.f. of Cityowned land (now cleared of improvements), the Government also took the two 25' by 100' lots remaining on the northwest corner of Humboldt St. and Debevoise St., which were adjacent to both the City's land and the existing Post Office building, and were not owned by the City. These lots were improved. The Government paid $17,500 for one ($6.80 per s.f.) and $15,000 for the other ($6.00 per s.f.). The Government also had to demolish the improvements at a cost of about $2,000.
 
 
 5
 As a result, the Government had substantially cleared land for its Post Office extension and the City was left with a fragment of land that it claimed was inadequate for the intended playground. The problem before the trial court was to determine what would constitute 'just compensation' for the City.
 
 
 6
 The 15,000 s.f. taken by the Government consisted of the southern half of what had been parcels 23-26 and all of parcel 29. To meet its burden of establishing its right to compensation, the City attempted to introduce evidence as to the pro-rated cost to it of the land taken from parcels 23-26 and the full cost to it of parcel 29-- $74,093 and $78,593, respectively.
 
 
 7
 The City also attempted to introduce evidence relating to a proration of the various expenses attendant to the now futile condemnation and demolition, such as $2,992 for relocation of tenants, $8,465 for demolition, $1,145 for experts' fees, and $457 for the services of the City Real Estate Manager. All such prorated expenses were said to total $43,612. The court excluded this evidence as irrelevant.
 
 
 8
 Further attempting to establish the value of the 15,000 s.f., the City produced as a witness James Boyle, an experienced appraiser who had appraised the land in question for the City as part of its 1960 condemnation proceeding. Boyle's estimate of value was based largely upon his earlier appraisal, but witnesses for both the City and the Government testified that values in this area of Brooklyn are static and would not generally be changed by the passage of less than two years. He had placed a somewhat lower value on the parcels in question than the City had subsequently been required to pay. He had valued Nos. 23-26 at $114,472, which, pro-rated with respect to the one-half of each of these parcels taken by the Government, was $57,236; and he had valued No. 29 at $65,000. His total value for the 15,000 s.f. was, therefore, $122,236. His appraisal of the total value of the land originally taken by the City had been $576,522.
 
 
 9
 Boyle also testified as to the cost of what was said to be the only reasonably available adjacent site for an adequate playground-- across Varet St. running north to Moore St. The 29,150 s.f. required there would cost $355,000 or $12.18 per s.f. To this there would be added expense for demolition of existing improvements and related charges. Boyle added that the $12.18 per s.f. for that property was $1.12 per s.f. greater than the $11.06 per s.f. which he contended was the value of the 15,000 s.f. taken by the Government, i.e., his $122,236 appraisal plus $43,612 in prorated expenses. This differential, which ran to $32,648 for the 29,150 s.f. in question, he termed 'severance damages.'
 
 
 10
 The Government sought to have all of Boyle's testimony stricken as irrelevant, and the trial court said it would not be considered as having 'any relevancy.'
 
 
 11
 The Government then produced as a witness William Stewart, an appraiser who had made appraisals for the owners of several of the parcels involved in the City's 1960 condemnation (none of which was now being taken). At the behest of the General Services Administration, he had visited the site in December 1961 and January 1962, when the land had been cleared. Using a before-and-after value technique, he found due compensation to be $41,250. This conclusion was based on the following reasoning. In his opinion, based on sales of allegedly comparable vacant land in the neighborhood, the value of the 30,000 s.f. south of what had been Cook St. was $2.25 per s.f. before the taking. Adding a 10 percent plottage allowance (apparently awarded customarily if the area is in excess of 4,000 s.f., see Helman, Presentation of a Condemnation Case in the Courts, N.Y.L.J., May 28, 1965, p. 4, cols. 1, 2), its total value was $74,250. After the taking, he considered the remaining land to have a value of $2.00 per s.f. due to the shortened dimensions, which, with a 10% Plottage allowance, resulted in a value of $33,000. The difference was $41,250.
 
 
 12
 Stewart's value of $2.25 per s.f. was based, he said, on 5 sales of essentially vacant land, where the lots ranged in size from 1,875 s.f. to 4,550 s.f.; the others were about 2,500 s.f., 2,830 s.f., and 2,940 s.f.
 
 
 13
 Although the City claimed $198,496 as just compensation ($122,236-- value as of acquisition, $43,612-- expense of acquisition and clearance, and $32,648-- severance damage), the trial court awarded only $41,250, the exact figure given by the Government's witness.
 
 
 14
 For property it takes for a public purpose, the Government must pay 'just compensation.' As a general working rule, just compensation is often said to be what a willing buyer would pay a willing seller at the time of the taking, considering the highest and best use of the property in its then condition and situation. The City supports its contention that the compensation awarded to it was grossly inadequate by two lines of argument. The first is that the trial court improperly refused to consider certain evidence, principally the cost of the land to the City and its value when acquired, which were relevant to a determination of the land's fair market value. The City's second line of argument is that under the circumstances of this case fair market value, as the term is generally understood, is not the proper measure of the compensation due to the City.
 
 
 15
 In answer to the City's first argument, the Government argues that 'original cost is well termed the 'false standard of the past' where * * * present market value in no way reflects that cost.' United States v. Toronto, Hamilton & Buffalo Nav. Co., 338 U.S. 396, 403, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). The City, like any other landowner, is not entitled to recover what it paid for property merely because such amounts have been spent. However, the City's evaluations and proof of the cost of assembling and clearing this relatively large site was not irrelevant in determining what a willing buyer would pay and what a willing seller would take for 15,000 s.f. of cleared land, a plot admitted by Stewart to be 'almost impossible to find' in this entirely builtup area.
 
 
 16
 One of the best indicia of the market value of specific property would be the value established by a recent transaction involving that very property. Because recent sales of the condemned property are not always available, evidence of contemporaneous sales of similar property will generally be relevant, but stress must be placed on the all important requirement 'similar.' The particular relevance of all data will depend upon such factors as time, the relative size of the properties, their condition, the nature of the respective neighborhoods, and the circumstances of the sale. See generally 1 Orgel, Valuation Under Eminent Domain, 136-37 (2d ed. 1953). The relatively greater availability of the smaller vacant lots (most less than one-fifth the size of the one being valued) relied on by Stewart in forming his opinion surely would diminish their similarity and relevance, although the information might still be admissible over objection. In order to obtain a lot of 15,000 s.f. in this area appropriate for the needs of a likely buyer of such a lot, it is apparent that smaller, contiguous, improved lots would have to be purchased from their probably diverse owners and cleared of their improvements. This is what the City had to do. This is what the Government would presumably have had to do if the City had not already done so. This is what the Government in fact did with respect to the two remaining lots not taken by the City. Accordingly, the market value of the resulting cleared large lot would reflect to some extent the costs of acquisition and demolition, and there is little doubt 'that willing vendees and vendors would deem such evidence and information relevant in their negotiations.' United States v. Certain Interests in Property, 296 F.2d 264, 270 (4th Cir. 1961); see Winston v. United States, 342 F.2d 715, 724 (9th Cir. 1965).
 
 
 17
 Although Stewart said that his basic value of $2.25 per s.f. took account of the large size of the plot, we cannot say that the basis of his opinion was demonstrably more probative than some of the evidence offered by the City. More specifically, some weight should have been given to Boyle's appraisal. His role in the earlier proceeding as an appraiser for the taker, not wanting to pay more than was necessary, suggests that his appraisal was unlikely to be too generous. Indeed, it was considerably below the amount the City was required to pay in that proceeding. The latter amount might also be thought relevant, at least if upon examination it were shown to cover no more than what a buyer of the property would be likely to pay for. Demolition costs are quite pertinent. Stewart's testimony indicates that the need for demolition of improvements would affect his estimate of the value of a lot. After all, fewer people are likely to be in the market for property at a given price if they have to bear the expense of demolition to make the property useful to them, than if they do not.
 
 
 18
 We support the trial court's exercise of discretion with respect to the costs of relocation, the experts' fees, and the wages of the City Real Estate Manager. They are not so integrally related to the value of 15,000 s.f. of cleared land in Williamsburg.
 
 
 19
 The City's second line of argument is directed at the trial court's refusal to consider the cost to the City of providing necessary substitute playground facilities. We find the court's refusal to do so to have been erroneous. 'The key notion (of just compensation) is indemnity, measured in money, for the owner's loss of the condemned property,' Westchester County Park Comm'n v. United States, 143 F.2d 688, 691 (2d Cir.), cert. denied, 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583 (1944), and we must be careful not 'to translate a formula which produces fair results in many cases into a categorical imperative that must be applied regardless of consequences.' United States v. Certain Property, 344 F.2d 142, 146 (2d Cir. 1965). Therefore, strict application of the market value rule of compensation will often be abandoned when the nature of the property or its uses produce a wide discrepancy between the value of the property to the owner and the price at which it could be sold to anyone else. See 1 Orgel, 37, at 173, cf. Spies & McCoid, Recovery of Consequential Damages in Eminent Domain, 48 Va.L.Rev. 437 (1962). The City urges that this is such a case.
 
 
 20
 The trial court was of the view that interference with the City's playground plans 'hasn't anything to do with the value of the property the Government has taken. It has absolutely nothing to do with it.' This overstatement perhaps follows from the fact that City's presentation of the issue was not as adequate as it might have been.
 
 
 21
 One way in which a necessary element of justice is added to compensation under the market value rule is to allow 'severance damages,' that is, payment for the lessening in value of part of property not taken as a result of a partial taking. See generally 1 Orgel 47-65. The Government does not dispute that severance damages are justified here.
 
 
 22
 But the additional cost of land for an adequate playground may fit more neatly into another pigeon hole than in the traditional severance damage category. It may be more proper to treat it under the rubric of the substitute facility doctrine, namely, to provide such substitute facilities as are 'necessary' to carry out the public function served by the condemned property. Here the Board of Education is required by law to provide a playground. The one provided for was to be operated on a seven-day basis with the Parks Department, which requires that the area of the grounds be about one acre (43,740 s.f.). At least 40,000 s.f. had been set aside for this purpose, of which 15,000 has now been taken. Part of the remaining area is apparently being used to provide a playground, and the Board is perhaps thereby fulfilling its strict legal obligation. But 'necessity,' as is seen in the usual case dealing with a condemned street or bridge, see United States v. City of New York, 168 F.2d 387 (2d Cir. 1948); City of Fort Worth v. United States, 188 F.2d 217, 222-223 (5th Cir. 1951); State of Washington v. United States, 214 F.2d 33, 39-40 (9th Cir.), cert. denied, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954); Franklin County v. United States, 341 F.2d 106 (5th Cir. 1965); 1 Orgel 42; looks to the pragmatic needs and possibilities, not just to technical legal minima. See United States v. Des Moines County, 148 F.2d 448, 449 (8th Cir.), cert. denied, 326 U.S. 743, 66 S.Ct. 56, 90 L.Ed. 444 (1945).
 
 
 23
 We see no reason a priori for treating a public street as more deserving of compensation for its replacement than a public playground might be, and the cases relied upon below do not suggest any. See United States v. 51.8 Acres of Land, 151 F.Supp. 631, 636 (E.D.N.Y.1957), aff'd sub nom. United States v. Jones Beach State Parkway Authority, 255 F.2d 329 (2d Cir.), cert. denied, 358 U.S. 832, 79 S.Ct. 55, 3 L.Ed.2d 71 (1958); Westchester County Park Comm'n v. United States, supra; United States v. State of South Dakota Game, Fish & Park Dept., 329 F.2d 665 (8th Cir.), cert. denied, 379 U.S. 900, 85 S.Ct. 187, 13 L.Ed.2d 175 (1964). Both may serve vital public functions and the absence of either might cause serious strain on other public facilities. In this case, the City authorities had decided that an adequate playground was more important for the area than was an untruncated Cook St.
 
 
 24
 Under this view, if a playground is found to be 'necessary,' the City may well be entitled to the amount needed to acquire and prepare the additional land, less the value of the land still held, if any, that was not a necessary part of the playground. This would appear to be the end implicitly sought by the City's calculation of the difference of $1.06 as 'severance damages.' What the City is saying, in effect, is that it is entitled to the cost of providing a 'necessary' substitute facility less the amount that could be realized by disposing of property that no longer need be devoted to the public function to be served by the substitute. Cf. Town of Winchester v. Cox, 129 Conn. 106, 115, 26 A.2d 592, 597 (1942). If the land taken was not to be used in a manner justifying compensation on this basis, however, the City would be entitled to the market value of the land taken, just like any other landowner.[1] Only in this sense should the substitute facility rule be seen as an alternative to the market value rule. It makes little difference whether the award is labelled: 'value of land taken' plus 'excess cost of substitute facility over value of land taken' less 'value of land not taken and freed for other disposition' or 'cost of substitute facility' less 'value of land not taken and freed for other disposition.' The amount is the same.
 
 
 25
 We leave open for the new trial whether a new playground is in fact necessary, how much land would be needed if it is, the expense involved in such a project, whether the 15,000 s.f. not taken could be part of the substitute, and what is its value.[2] Even if a new playground is not 'necessary,' there must be a new trial to determine just compensation to the City for the value of the property taken, giving consideration to the evidence we find improperly disregarded.
 
 
 26
 Reversed and remanded.
 
 
 
 [1]
 As to the noncompensability of the excess cost of new facilities for the private landowner, see 1 Orgel 71
 
 
 [2]
 We find that there was no abuse of discretion in excluding the evidence relating to Post Office-Board of Education understandings